Filed 4/21/15  P. v. Rodriguez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

IRVIN RODRIGUEZ et al.,

    Defendants and Appellants.

E058377

(Super.Ct.No. FSB1202274)

OPINION

APPEAL from the Superior Court of San Bernardino County.  William Jefferson Powell, IV, Judge.  Affirmed in part; reversed in part with directions.

Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and Appellant Irvin Rodriguez.

Kenneth H. Nordin, under appointment by the Court of Appeal, for Defendant and Appellant Udy Cardenas.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant Juan Ricardo Rodriguez.

1

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Udy Cardenas of the substantive gang offense (Pen. Code, § 186.22, subd. (a))[1] and in bifurcated proceedings, he admitted having suffered convictions for one strike prior (§ 667, subds. (b)-(i)), one serious prior (§ 667, subd. (a)(1)) and one prior for which he served a prison term (§ 667.5, subd. (b)).  The jury also convicted Irvin Rodriguez (Irvin) of second degree robbery (§ 211), which was committed for the benefit of a gang (§ 186.22, subd. (b)(1)) and during which he used a knife (§ 12022, subd. (b)(1)) and the substantive gang offense.  In bifurcated proceedings, he admitted suffering convictions for a strike prior, a serious prior and a prior for which he served a prison term.  Finally, the jury convicted Juan Rodriguez (Juan) of second degree robbery, two counts of assault with a deadly weapon (§ 245, subd. (a)(1)), all of which were committed for the benefit of a gang, and during one of which, Juan inflicted great bodily injury (§ 12022.7, subd. (a)) and the substantive gang offense.  In bifurcated proceedings, Juan admitted having suffered convictions for a strike prior, a serious prior and a prior for which he served a prison term.  Cardenas was sentenced to 12 years in prison, Irvin to 27 and Juan to 43.  Defendants make various claims and variously join in each others' claims.  We reject all their claims, save Juan's that the sentencing court erred in imposing a three-year term for the great bodily injury enhancement attached to one of

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

his assault convictions (count two). Therefore, we will strike the sentence for the great bodily harm enhancement on count two. Otherwise, we affirm.

FACTS

The victim of one of the assaults for which Juan was convicted (the first assault victim) testified that on May 28, 2012, a man and a woman were arguing in the street in front of her house. The man then entered the gate of the fence surrounding her house, saying, "East Side Verdugo" twice, with his hands up in a type of gang challenge gesture, and, "You are in my territory." This victim's husband tried to push the man out of the yard. The man was bald, was not wearing a shirt, revealing the tattoos on his chest, and wore dark cut off shorts. Both on the stand and at the post-arrest show-up that night this victim identified a picture of Juan as this man. At the show-up, Juan was wearing blue Dickies shorts. The man asked the first assault victim and her husband where they were from, which this victim interpreted to mean whether they belong to a gang. The husband was able to get the man off of the property and this victim told the man to leave. The man said, "Hey, homie. Hey, homie" and his companion ran up. The companion screamed "East Side Verdugo" and tried to swing at the husband and this victim's son. He wore a white t-shirt and shorts like the ones that Cardenas was wearing when he was apprehended later that night. He had a shaved head, as did Cardenas that night, although the second assault victim was unable to identify the picture of Cardenas as that of the companion, saying the companion's head was more closely shaved than Cardenas's was in the picture and he could have had a lighter complexion than Cardenas did in the picture. While the first man stayed near the female with whom he had been arguing, with

3

a knife in his hand, the first assault victim told the companion to leave. The man whom this victim had first encountered then moved towards this victim, but fell, scraping his arms in the process, (making them look like those depicted in a photograph later taken of Juan), then got back up. This man then got "in [the first assault victim] face" and put the knife four inches from it, in a stabbing motion, saying, "Back the fuck off, bitch." She told him to please leave. The victim of the other assault (the second assault victim) came up behind the first assault victim and told this man to calm down. This man turned and stabbed the second assault victim. He waived his knife around and almost hit another member of the family of these victims with it. This man wouldn't leave, but his companion shoved him away, with the help of two females, including the one who had originally been with the former, saying, "Let's go, let's go. You just fucked up." The woman who had been with this man was also at the show-up after the defendants had been apprehended by the police.

The first assault victim's husband testified that the first man who appeared at his home, whom the husband identified as Juan, had been putting a knife in the face of the woman with whom he had been arguing in the street. Juan wore shorts and had tattoos on his chest. Juan asked the husband, "What are you looking at, bitch?" and he called him nosy. He tried to enter the gate of the yard, but the husband closed it on him. Juan threatened the husband with the knife. The first assault victim went outside the fence and got near Juan, and her husband followed her. Juan put the knife near her forehead. Juan called for help and when his companion appeared, both came at the husband, yelling either "West Verdugo" or "East Verdugo." The companion said, "What's up? What's

4

up?" and put his fist in the air, indicating that he wanted to fight, and both men said, "East Side Verdugo." The husband jumped over his fence, swung at the companion, then Juan tried to hit the husband but fell down in glass. The companion tried to get him up. Juan got up and tried to hit the husband, then family members pulled the husband away. Juan stabbed the second assault victim. The companion said, "Let's go, let's go. There's kids here."[2] The companion wore a white t-shirt and plaid shorts that were similar to those Cardenas was wearing when he was apprehended later that night.

The second assault victim testified that the man who stabbed him wore no shirt and had letters tattooed on his chest. Juan has an "ES" tattooed on his chest.

Juan was convicted of these assaults, and, although Cardenas had also been charged with them, the jury had found him not guilty.

The victim of the robbery testified that at 9:45 p.m. on May 28, 2012, he was riding his bike near where the incidents involving the assault victims lived and the Zarate home (concerning count five) when a 1998 or 1999 four-door black Honda Accord with tinted windows passed him, slowed down, continued on, then stopped. Two men got out and one asked this victim where he was from and for his bike. Although this victim originally identified Cardenas at trial as the man who pulled a knife or a screwdriver out of his sweater pocket, he later identified this man as Irvin. This man wore what this victim described as "checked" shorts and a black hooded zip-up sweater, which was pulled down over his forehead. Irvin was wearing plaid shorts when he was apprehended

---

[2] The first assault victim and her husband were hosting a barbeque in their backyard attended by, inter alia, children.

5

a short time later.  The victim dropped his bike and ran and the man with the knife ran after him, then stopped.  The other man rode off with the victim's bike.  He wore no shirt, had dark blue Dickies shorts and had tattoos on his chest, arms and stomach.  Juan was shirtless and was wearing dark blue Dickies when apprehended a short time later.  He had large tattoos on his chest and stomach.  The robbery victim told the police that the men said, "East Side Verdugo, Bitch" as he ran away from them.

The police officer who went to the robbery victim's house to talk to him testified that the robbery call came in at 9:50 p.m.  The robbery victim identified Irvin at the show-up as the man with the knife and Juan as the man who had ridden off with his bike, although during the show-up, Irvin was wearing a shirt.  The victim said he was one hundred percent sure of his identification.  He described the man with the knife as having no shirt and tattoos on his stomach.  Although Cardenas was in the show-up, this victim did not identify him during it.  He told the officer that the men put his bike in their car and drove off.  The car in which the defendants were apprehended was black with a gray hood.  No bike was found in the car.

The facts concerning the substantive gang offense (count five) and the apprehension of the defendants and their membership in a criminal street gang will be described below.

1. *Denial of Irvin's Pitchess[3] Motion[4]*

Noting that Deputy Sheriffs A and P were then facing charges in another case—Deputy P for allegedly assaulting a civilian and Deputy A for falsely impersonating another officer during the assault—Irvin requested discovery of "[a]ny evidence of . . . false arrest, false statements in reports, false claims of probable cause, or any other evidence of or complaints of dishonesty" in the personnel files of these deputies. Irvin alleged that in the current case Deputy A "conducted the in-field show-up with an alleged victim, as well as took his statement" and Deputy P "was involved with the investigation and show-up procedure . . . ." Irvin asserted that he planned to "defend himself with allegations of police misconduct, including, but not limited to false or inaccurate police reports and witness tampering." In his declaration in support of the motion, counsel for Irvin asserted that the deputies "falsified police reports, conducted improper in-field show-ups and were improperly suggestive with witnesses" and that "Irvin . . . contends that the [deputies'] actions are responsible for him facing the . . . criminal charges in this case. At that point, Irvin was asserting an alibi defense to the crimes charged against

---

[3] *Pitchess v. Superior Court* (1974) 11 Cal.3d. 531.

[4] While noting that his attorney was not present at the *Pitchess* motion, still Juan requests that this court "apply any benefit of this claim to [Juan], as [Juan] stands in [Irvin's] shoes with respect to the officers' ability to conduct suggestive lineups and inaccurately report identifications." Unfortunately for Juan, none of the facts on which Irvin brought his *Pitchess* motion and the allegations made therein specifically relate to Juan and Juan failed to join the motion. Therefore, he waived whatever error occurred in the trial court's denial of Irvin's *Pitchess* motion.

him—the inference being that to the extent he was identified by any victims or witnesses to those offenses, the deputies in question had set up a suggestive show-up and/or tampered with those victims and witnesses and/or had falsified reports in which any of those victims or witnesses had identified defendant as a perpetrator of the crimes charged against him.

In their opposition to Irvin's motion, the People alleged that three different offenses had been committed on May 28, 2012—a stabbing, the brandishing of a weapon and a robbery at knife-point—and a car matching the description of the car involved in all three containing, inter alia, Irvin, had been subsequently pulled over and that officers, including the deputies in question, "transported witnesses from [all three crimes] . . . for an in-field lineup[,]" during which Irvin was identified as "being involved in one or more of the crimes." The People added that Deputy P had transported only the witnesses involved in the stabbing, who identified someone else, but not Irvin, as the stabber.[5] Irvin was charged only with robbery with the use of a knife and street terrorism, the later based either on an aggravated assault the three defendants committed after a person refused to give them a cigarette or being a felon in possession of a firearm during that incident. Irvin made no allegation either in his moving papers or during argument at the hearing on the motion that any victim or witness to this crime was involved in the show-

---

[5] Indeed, during the preliminary hearing, which preceded Irvin's *Pitchess* motion (which motion was based on, inter alia, "the records filed in this action"), this deputy testified that he transported the first assault victim and her husband to the scene of the show-up, that *he* "showed" Juan to the couple at the show-up and they identified the perpetrator of the assault of the second assault victim as Juan. Irvin was *never* charged with either of these counts.

up identification of him.[6]  His comments were confined to the robbery at knife-point. The People asserted that Irvin's moving papers, inter alia, failed to set forth "a specific factual scenario to support" an in-camera review of the deputies' records.

At the hearing on the motion, counsel for Irvin noted that the People had already turned over 300 pages of discovery concerning the deputies' then-pending criminal charges.  He reasserted that Deputy A had conducted the show-up and it was suggestive, but he did not say how.  The trial court asked counsel what his basis, "other than guesswork[,]" was for inferring that the deputies had persuaded witnesses or victims to identify Irvin during the show-up.  Counsel responded, "I think the standard is that . . . it does not have to be even plausible.  And the defendant . . . doesn't have to establish to the [c]ourt that he was . . . an eyewitness to all of these things that happened.  I think it's not an issue in dispute for the period [of the show-up that] the officer [(presumably, Deputy A)] had the alleged victim and had some question to the victim or pointing at [Irvin] and asking the victim if that was, in fact, him, or anything to that fact, that he was in the vicinity. . . .  And I don't think that anything more than what I put in my moving papers or the low . . . line of plausibility is required."  In response to the trial court's question

---

[6] At the preliminary hearing, a deputy not named in the *Pitchess* motion testified that *he* showed Irvin to a witness to this crime at the show-up, after giving the witness an admonition, and he heard this witness say that Irvin had told Juan, during this crime, to pull his gun and "blast these fools."  He also testified that the woman who was in the car with the defendants when the car was stopped by police told him that Irvin had said that they were from East Side Verdugo Meadowbrook.  Another deputy, also not named in the *Pitchess* motion, testified at the preliminary hearing that she interviewed two witnesses to this crime and she confirmed that the afore-mentioned deputy "did" the show-up involving this witness.

whether Irvin's position was that there had been a line-up, Irvin had been identified in it and he had been identified due to police misconduct, counsel asserted that Irvin had been identified in the show-up because of the misconduct of the deputies. When the court asked counsel what that misconduct was alleged to be, counsel responded, "I believe the misconduct was possibly . . . that the officers had a suggestive lineup, pointed to somebody, didn't perhaps give the admonishment, did not go in proper order how they went through their protocol. Coupling that with the fact that . . . [Irvin] was actually not even necessarily identified by the victims they say he was identified by. . . . Coupled with that, . . . [Deputy A is] being charged with what amounts to misconduct [in another case]." In response to another question by the court, counsel said he was requesting discovery of citizen complaints involving fabrication of police reports. The court noted that it had not been given a copy of a police report authored by either deputy, or anyone else.

The trial court denied the motion, finding that good cause had not been established to review the deputies' personnel records for prior complaints. The court added, "There are general allegations, . . . it's not that they are implausible, I am not concerned about the implausibility. I think [counsel for Irvin] is right about that[, that the good cause] [¶] . . . doesn't have to be something that actually persuades the court that [it] is, in fact, true; [but] it has to be plausible. [¶] I can't identify precisely what they are and what the [c]ourt would be looking for."

We review a denial of a *Pitchess* motion for abuse of discretion. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039.) We cannot agree with Irvin that he has

demonstrated that the trial court acted unreasonably (*Sisson v. Superior Court* (2013) 216 Cal.App.4th 24, 34 (*Sisson*)) in denying his motion. While we agree with him that he was fairly clear about what kind of reports he wanted the trial court to review, what wasn't clear was what each deputy had assertedly done. The affidavit supporting the defendant's motion must contain a "'specific factual scenario' which provide[s] sufficient information to allow the trial court to assess whether the records were material[.]" (*City of San Jose v. Superior Court* (1998) 67 Cal.App.4th 1135, 1146.) "The defendant . . . must provide "'a plausible scenario . . . that might or could have occurred." [Citation.] A scenario is plausible when it asserts specific misconduct that is . . . internally consistent . . . ." (*People v. Sanderson* (2010) 181 Cal.App.4th 1334, 1340 (*Sanderson*) [Fourth Dist., Div. Two].)

In *People v. Collins* (2004) 115 Cal.App.4th 137, 151, the trial court denied the defendant's motion where he alleged that two officers "did not follow policy and procedures, destroyed material evidence, and failed to follow search procedures . . . , tamper[ed] with evidence[,] acting without probable cause on an unreliable and bogus confidential letter that was destroyed by design . . . ." (*Id*. at pp. 149-150.) The appellate court concluded that the trial court had not abused its discretion in denying the motion because, inter alia, "defendant's declaration merely made general allegations of misconduct against [the officers] without alleging any facts that provided reason to believe the misconduct had occurred. Consequently, defendant failed to establish a 'specific factual scenario' establishing a 'plausible factual foundation' for allegations of

11

misconduct by [the officers] that would justify discovery of their personnel records." (*Id.* at pp. 151-152.)

In *People v. Thompson* (2006) 141 Cal.App.4th 1312, 1315, 1317, the defendant sought the records of nine police officers and two detectives, based on his assertion that one of the officers had not purchased drugs from him, which purchase was witnessed by seven of the other officers and the two detectives, with the last officer finding the buy money used for the purchase on the defendant's person afterward. The defendant asserted that he had been targeted by the officers simply because he was in an area known for drug trafficking, and after an officer stopped him and realized that he had a record, all the officers and the detectives fabricated the events, using narcotics that were already in their possession. (*Id.* at p. 1317.) The appellate court held, "This showing is insufficient because is not internally consistent or complete. . . . [I]t does not present a factual account of the scope of the alleged police misconduct, and does not explain [the defendant's] own actions in a manner that adequately supports his defense. [The defendant] . . . denied he was in possession of [the drug] or received [buy money] from [the o]fficer . . . [b]ut he does not state a nonculpable explanation for his presence in an area where drugs were being sold, sufficiently present a factual basis for being singled out by the police, or assert any 'mishandling of the situation' prior to his detention and arrest. Counsel's declaration simply denied the elements of the offense charged. [¶] [The defendant's] denials 'might or could have occurred' in the sense that virtually anything is possible. *Warrick* [*v. Superior Court* (2005) 35 Cal.4th 1011, 1026] did not redefine the word 'plausible' as synonymous with 'possible,' and *does not require an in*

12

*camera review based on a showing that is merely* imaginable or *conceivable* and, therefore, not patently impossible. *Warrick* permits courts to apply common sense in determining what is plausible, and to make determinations based on a reasonable and realistic assessment of the facts and allegations." (*Id.* at pp. 1317-1319, italics added.)

In *Sisson*, *supra*, 216 Cal.App.4th 24, Division One of this court concluded that the trial court did not abuse its discretion in denying discovery where the defendant alleged that an officer "was evasive in his account of events and lied about seeing little to none of the incident likely because he did not want to contradict his fellow officers." (*Id.* at p. 32.) Division One said of this, "[The defendant] has not met the good cause requirement. . . . [The] declaration . . . states [this officer] was evasive in his account of events, but [it] does not elaborate on this point. Likewise, [it] states [that the officer] lied about seeing little to none of the incident, but [it] does not provide a specific factual scenario with a plausible factual foundation to support this statement." (*Id*. at p. 35.)

Here, Irvin failed to distinguish one of the deputies from the other, except to say that Deputy A conducted the show-up with "an" alleged victim and took that victim's statement. He did not assert which of the victims this was. Irvin failed to even assert that either deputy had actually authored a report and none was supplied to the trial court. Irvin asserted that the Deputy P was "involved with . . . the show-up procedure" but, again, he did not say in relation to what victims or witnesses and he did not assert how he was involved in the procedure. The People's opposition asserted that Deputy P had transported only witnesses involved in an offense for which Irvin had not been charged. For the trial court to have ordered examination of this deputy's personnel records under

13

these circumstances would have been an abuse of discretion. As to Deputy A, Irvin was unable to articulate how the show-up was suggestive or what he was asserting the deputy did. Irvin supplied no facts concerning the identification procedures, i.e., how many officers were involved that might have talked to victims and whether the witnesses and the victims of the crimes with which he was charged identified him. What Irvin proposed to the trial court was to find good cause based merely on the fact that Irvin claimed he did not commit one of the three crimes for which the show-up procedure was conducted and the deputies, involved in some way in that procedure or reports concerning it, had the misfortune of having charges pending against them in another case. Irvin did not request the personnel files of any other officer involved, although, according to the People's moving papers, clearly, others were.[7] So, it was the pending charges that distinguished these deputies from all the other officers who participated in some manner in the show-up or the reporting of it. As *Collins* and *Sisson* held, more specificity than this must be required before imposing on the trial court the job of combing through two officers' personnel files for evidence of falsehood and before subjecting the confidentiality of those files to examination by the trial court. As this court held in *Sanderson*, *supra*, 181 Cal.App.4th at pages 1334, 1340, 1341, defendant's mere denial of criminal responsibility is insufficient to trigger an obligation on the part of the trial court to conduct an in camera review. Finally, as the appellate court concluded in *Thompson*, the possibility that Deputy A conducted a suggestive lineup, that she and/or Deputy P said

---

[7] See footnote six, *ante*, page nine.

14

things to victims or witnesses, pointed to Irvin, didn't give the admonition and/or didn't go in the proper order was not sufficient.

2. *Admission of Priors*

Before trial began, the People brought a motion to admit evidence of Juan's and Irvin's prior acts on March 27, 2009, which resulted in their convictions for violating section 245, subdivision (a)(2). The People asserted that Juan and Irvin were in a vehicle that was involved in a drive-by shooting and Juan admitted to being in the location inside the car that witnesses said was where the shooter had been sitting. The People further asserted that Juan and Irvin were in the company of other documented members of East Side Verdugo Meadowbrook, that they were also members of that gang, that it occurred in the same East Side Verdugo Meadowbrook turf as the charged crimes and, like them, it appeared to be turf-related/done to control the neighborhood by intimidating people who lived in the area. The People sought admission of this evidence to prove that the charged crimes were gang-related or were committed to benefit the gang. The trial court concluded that these priors and the charged crimes were substantially similar for purposes of proving Juan's and Irvin's intent during the latter (i.e., that the latter were committed to benefit their gang), that the evidence was not unduly prejudicial and that it was being admitted for another purpose, which will be discussed below.

As part of their motions in limine, the People also sought admission of the fact that Cardenas had been convicted of violating section 245, subdivision (a)(1) (assault with a deadly weapon or by means of force likely to cause great bodily injury, but not a firearm) in 2009 and 2005, that Juan had been convicted of violating section 245, subdivision

15

(a)(1) in 2011 and section 245, subdivision (a)(2) (assault with a firearm) in 2009, and that Irvin had been convicted of violating section 245, subdivision (a)(2) in 2009 and section 245, subdivision (a)(1) in 2008. The People sought admission of these convictions in order to prove, for purposes of the charged substantive gang crime, that when he participated in the gang, each defendant knew that members engaged in or had engaged in a pattern of criminal activity and that each assisted felonious conduct by gang members by either directly and actively committing felonies or aiding and abetting felonies. During the hearing on this, the discussion revolved around the correct application of the holding in *People v. Tran* (2011) 51 Cal.4th 1040 (*Tran*), which the trial court interpreted as prohibiting admission only if the prior crimes are substantially more inflammatory than the charged offenses.[8] The trial court agreed with the People that the priors were highly probative to prove that the defendants knew that their gang engaged in a pattern of criminal activity in that they, themselves, engaged in that pattern. The trial court further concluded that the evidence was not so inflammatory as to deny any of the defendants a fair trial or undermine the reliability of the trial's outcome and its prejudicial impact did not outweigh its probative value.

---

[8] Counsel for Juan and Cardenas argued that because the priors here were identical to the charged offenses, *Tran*, which involved substantially less inflammatory priors than the current charges, did not support admission, and the jury would use the priors as propensity evidence. Counsel for Irvin argued that because the 2009 priors resulted from a drive-by shooting, it was more inflammatory than the current charges. Counsel for Irvin and Cardenas also asserted that *Tran* discussed the fact that the priors there were gang-related, while Cardenas's priors were not.

The defendants contend that the trial court abused its discretion in admitting the prior convictions on a basis not advanced below, i.e., that it was cumulative because other, less inflammatory evidence was introduced which could have served as the predicate offenses. Because none of the defendants mentioned this at the time the trial court made its ruling, they waived the matter. (Evid. Code, § 353.)

As to one of the bases that was asserted below, i.e., that the evidence was more prejudicial than probative, defendants assert that their priors were more serious than the current charges, because they involved a firearm. However, only two of the priors involved a firearm—Juan's in 2009 and Irvin's in the same year. As to Juan, we do not view the current offenses, which included a charge that he stabbed the second assault victim, causing great bodily injury, to be less prejudicial than a conviction for assault with a firearm. As to Irvin, we do not view his prior conviction for assault with a firearm to be more substantially prejudicial than the charged use of a knife during the bike robbery. Moreover, because the trial court allowed admission of evidence surrounding these convictions under section 1101, subdivision (b), which we conclude below was not error, the jury would have been made aware of the fact that a gun was involved in those offenses anyway.

The defendants also take issue with the trial court's ruling admitting evidence of Juan's and Irvin's acts in 2009 that resulted in their convictions of assault with a firearm. They assert that no evidence was presented to show the similarity between the 2009 acts

17

and the charged offenses. However, in their moving papers,[9] the People asserted that the charged offenses occurred within the gang turf of East Side Verdugo, the second assault victim had been stabbed and witnesses identified Juan as the stabber, Juan also assaulted the first assault victim with a knife by holding it to her face while Cardenas was nearby and had thrown punches at family members of these victims. Juan and Cardenas mentioned gang slogans while engaging in these acts, the bike robbery was committed at knife-point, Irvin and Juan were identified as perpetrators, gang slogans were used and at the Zarates' home (which resulted in the substantive gang offense charge), Cardenas, Irvin and Juan fought with the Zarate brothers and their friend and yelled gang slogans while Juan had a gun. We have already recounted the facts surrounding the 2009 acts of Irvin and Juan. To the extent defendants contest the trial court's admission of this evidence, they must allege that the trial court did not have before it sufficient evidence of similarities between the two sets of offenses to permit admission of evidence of the earlier acts. The record belies this assertion. However, defendants appear to contest the admission of this evidence on the basis that *the jury* was not presented with evidence showing the similarity of the two sets of offenses. This is not a reason for finding error in the trial court's admission of the evidence. At the time it made its ruling, the trial court necessarily relied on the representations of counsel, which representations, as we have

---

[9] Although these papers concerned the motion in limine, which involved the priors of all three defendants, including the 2009 convictions of Juan and Irvin which were the subject of the People's section 1101, subdivision (b) motion, the trial court considered both motions at the same time.

18

already concluded, sufficiently set forth the similarities between the two sets of offenses to permit admission. Although, as defendants point out, the jury was instructed that it could consider evidence of the prior acts to prove motive, intent or a plan or scheme to commit the charged offense, and, in doing so, it was to evaluate the similarity or lack of similarity between the two sets of offenses, defendants do not assert that they objected to this instruction on the basis that there was insufficient evidence presented at trial to support the giving of it. Nor do they assert that once it became apparent to them that the People had failed to produce sufficient evidence of similarities *in the presence of the jury*, they renewed their objection to the introduction of this evidence on this basis. In truth, whatever was presented to the jury had nothing whatsoever to do with the propriety of the trial court's ruling, which preceded it. We can only hold the trial court accountable for what it knew at the time it made its ruling, and nothing else. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1393.)[10]

3. *Motion for Mistrial*

In between re-cross examinations of the bike robbery victim by defense attorneys, the trial court put on the record its observations that from the point in his testimony where this victim had asked Irvin and Juan to stand so he could identify them in court, often Juan was "less than happy" and he appeared to be making hand gestures towards this

---

[10] Although not relevant to the propriety of the trial court's ruling admitting the evidence, we refer defendants to the People's brief, which contains a description of the trial evidence that was presented concerning the 2009 acts. Ironically, in response to this setting forth of trial evidence, defendants counter, as do we here, that the trial evidence is irrelevant to the trial court's ruling as it was presented long after the court made its ruling.

victim and intentionally staring at him (what the court called "classic mad dogging") in what seemed to be an intentional effort to intimidate this victim. The court added that it was certain that four of the jurors also saw this. The prosecutor told the trial court that this victim had subsequently reported to a prosecution investigator that Juan had made hand gestures and had mad-dogged this victim while the latter was testifying about his family and this caused the victim to be concerned about himself and his family. Over the objection only of Juan's attorney, the trial court ruled that this victim could testify as to what Juan did during the former's testimony and the prosecution's gang expert could use it as a basis to opine whether this is a gang case and whether the acts are consistent with how gang members "treat" witnesses. The prosecutor requested that a limiting instruction be given, telling the jury that this had nothing to do with the other two defendants, to which both the trial court and Cardenas's attorney agreed. During re-direct examination of this victim, he testified that during his testimony about his family and after he testified about the identity of his assailants, Juan, inter alia, made the letters "I" and "E" with his fingers against his face and mad-dogged him.

Six court days after the beginning of trial, and three days after the aforementioned discussion and testimony, Irvin's counsel stated that he had "some *Crawford*[11] concerns" about the evidence concerning Juan's conduct because counsel did not have the opportunity to cross-examine Juan about it. He asserted that Juan's conduct prejudiced Irvin and he moved for a mistrial or to sever Irvin's case from Juan's, which

---

[11] *Crawford v. Washington* (2004) 541 U.S. 36.

20

Cardenas's attorney joined. The prosecutor pointed out that he had offered to have a limiting instruction given so Irvin and Cardenas would not be prejudiced. The trial court agreed, noting that the jury was going to be instructed that there are certain types of evidence it could consider concerning certain instances, but not others, and a limiting instruction was sufficient to ensure that the jury would use this evidence only against Juan.

Later, during the direct examination of the prosecution's gang expert, he testified as to what mad-dogging comprised and that it was an effort to intimidate this victim. The expert also testified that Juan making the letters "I" and "E" during this victim's testimony, which were designed to instill fear in the latter, showed that Juan was not afraid to show a gang sign in court and begged the question, "What is Juan capable of doing on the street if he will do this in a courtroom?"

The jury was instructed, in pertinent part, "If a defendant tried to . . . discourage someone from testifying against him, that conduct may show that he was aware of his guilt. It you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. . . . [¶] If you conclude that a defendant tried to . . . discourage . . . someone from testifying, you may consider that conduct only against that defendant. You may not consider that conduct in deciding whether any other

21

defendant is guilty or not guilty."[12]  The prosecutor reminded the jury of this during his

opening argument.[13]

Irvin and Cardenas here contend that the trial court erred in denying their motion

for a new trial.  In fact, they must demonstrate that the trial court abused its discretion,

that is, acted unreasonably, in denying the motion.  (*People v. Montes* (2014) 58 Cal.4th

809, 888.)  They assert that the evidence of Juan's conduct supported this victim's

---

[12]  We note that the parties waived reporting of the jury instructions at the conclusion of trial, a practice we view to be both unnecessary and dangerous.

[13]  We disagree with Irvin and Cardenas that the prosecutor invited the jury to use Juan's conduct against them by saying, "If the defendant tried to . . . discourage someone from testifying against them, that conduct may show that he was aware of his guilt.  [¶] If you conclude that a defendant made such an attempt, it is up to you to decide its importance and meaning.  You heard testimony that . . . while you were here in court, a witness while he was testifying was being subjected to what he believes was intimidation.  And you hear[d the prosecution's gang expert] indicate . . . how this is a classic gang-type thing.  If *they* are willing to do that in court, what would *they* be willing to do out on the streets?"  Earlier, the prosecutor had said, after reminding the jury that it was not to use evidence of Juan's in-court conduct against Cardenas and Irvin, "And you see how the gang works on intimidation, how [*Juan*] is so brazen to commit an act of intimidation even here in open court.  And as [the prosecution's gang expert] said, the witnesses have to know if gang members will intimidate them in this way in a court of law, what will *they* do out in the streets?"  We do not agree with the interpretation by Irvin and Cardenas of these statements that the prosecutor was attempting to attribute Juan's conduct to them.  The prosecutor was merely paraphrasing the expert's testimony about what Juan's conduct meant about *Juan* only.  We also disagree with a similar interpretation of the following by Irvin and Cardenas, "[Y]ou heard [the bike robbery victim] when he [reported Juan's conduct], how he indicated that he was in fear and he was in fear for his family.  Because this happened while he was testifying . . . about his family.  This is the classic gang case . . . :  [*t*]*hree* documented gang members committing gang crimes in the gang territory."

22

credibility[14] and the gang expert's testimony. They also assert that it would have been impossible for the jury, despite the limiting instruction, to not associate them with Juan's behavior. We disagree with all of these assertions. The victim's testimony about Juan's conduct did not, in and of itself, support his credibility to jurors who did not witness it for themselves. The jury was free to disbelieve the victim's report of Juan's conduct, just as it was free to disbelieve his pretrial and trial accounts of the bike robbery. Neither the victim's testimony about Juan's conduct nor the gang expert's interpretation of it supported the credibility of the latter. Again, the jury was free to reject his opinion about Juan's conduct during the trial, just as it was free to reject his opinion that these offenses were gang-related. More importantly, even if the victim's report of Juan's conduct supported the former's credibility to jurors who actually witnessed that conduct, we agree with the trial court that the limiting instruction prevented the jury from using it against either Irvin or Cardenas. We presume that the jury followed the instruction. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

*People v. Estrada* (1998) 63 Cal.App.4th 1090, which Irvin and Cardenas cite in support of their argument, is distinguishable. There, Division One of this court concluded that the defendant had been denied a fair trial by repeated statements of counsel for the codefendant *clearly implicating the defendant in the crime charged and attacking his credibility,* despite curative instruction as to some and the sustaining of objections as to some of the others. (*Id.* at pp. 1095-1102, 1104-1106.) Division One

---

[14] Of course, because Cardenas had not been charged with the crime involving this victim, the credibility of this victim was irrelevant to Cardenas.

23

observed, "*While a curative admonishment might be meaningful when some isolated incident of misconduct occurs, it is less useful when the misconduct is, as it was here, constant and pervasive.*" (*Id.* at p. 1099, italics added.) "We join with [the defendant's] trial counsel, the prosecutor and the trial judge in noting that we have never seen a display of misconduct rivaling that of [counsel for the codefendant] in this case. . . . [H]e did everything in his power, ethical and otherwise, to destroy [the defendant's] credibility. . . . [His statements] were all highly improper. [¶] . . . [The defendant's] credibility was central to his defense." (*Id.* at pp. 1106-1107.)

Cardenas asserts that we should liken this situation to the admission of a statement by a codefendant which implicates the defendant, despite the presence of a limiting instruction because "of the substantial risk that the jury . . . looked to the incriminating . . . statements in determining [the defendant's] guilt[.]" (*Bruton v. United States* (1968) 391 U.S. 123, 126 [88 S.Ct. 1620].) For one of the same reasons *Estrada* is distinguishable from the case here, *Bruton* is inapplicable to these facts, i.e, Juan's conduct did not implicate either Irvin or Cardenas. (*People v. Homick* (2012) 55 Cal.4th 816, 875.) We further note that Cardenas agreed with the trial court and the prosecutor that the limiting instruction was the proper "cure" for the introduction of this evidence.

4. *Cumulative Error*

Having concluded that the trial court did not err in admitting defendants' prior convictions, either to prove the elements of the gang allegations and the substantive gang charge, or under section 1101, subdivision (b), and in denying the motion for mistrial, we necessarily conclude that there was no cumulative error in these rulings.

5. *Insufficient Evidence to Support the Gang Allegation Findings*

   a. *Primary Activities*

The prosecution's gang expert opined that East Side Verdugo, of which all three defendants were members, was a criminal street gang whose primary activities are assaults, thefts and "weapons charges." He added that East Side Verdugo members have also been involved in other activities that are criminally related, i.e., robberies and murders. The jury's task in determining that the group of which the defendants were members was a criminal street gang, both for purposes of the enhancement allegations and the substantive offense, was confused due to the instruction that was given on the subject, which required the jury to find only that the group had "as one or more of its primary activities, the commission of [a]ssault with [d]eadly [w]eapons, [and a]ssaults with [f]orce [l]ikely to [p]roduce [g]reat [b]odily [i]njury . . . ." The instruction further provided that the jury could consider whatever crimes it found the defendants committed in the instant case in deciding whether one of the group's primary activities was commission of that crime. The defendants here assert that the testimony of the gang expert, as set forth above, constitutes insufficient evidence that the gang's primary activities are those listed in section 186.22, subdivision (e). However, they fail to consider the effect of the crimes for which the jury found the defendants guilty, which included either assault with force likely to produce great bodily injury or felon in possession of a firearm for all three defendants (count five) and two assaults with a deadly weapon for Juan. In addition, evidence was presented that yet another member of the group had been convicted of a 2010 assault with a deadly weapon and another of

25

voluntary manslaughter in 2007, when the member fired at others, killing one victim, during gang retaliation.

The question remains whether the expert's opinion that the primary activities of the group included assaults, combined with the defendants' and other members' prior convictions for aggravated assaults and defendants' current convictions for the same constitute sufficient evidence to support the jury's implied finding that one of the primary activities of the group was "assault with a deadly weapon or by means of force likely to produce great bodily injury" (§ 186.22, subd. (e)(1)) "consistently and repeatedly." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 324.) Defendants cite no authority holding that it is not. Defendants contend that seven aggravated assaults in a gang of 85 members is insufficient. However, the gang expert testified that there were only 40 to 50 active members.

b. *Structure of East Side Verdugo*

The prosecution's gang expert testified that Meadowbrook is the most active, largest and most visible of the five cliques or sets within East Side Verdugo and Meadowbrook's members are from the Meadowbrook geographic area within East Side Verdugo's turf, but Meadowbrook remains under East Side Verdugo's umbrella. He also testified that all the cliques of East Side Verdugo got along with each other and were "aligned." He opined as to what constituted the primary activities and the pattern of criminal activity of East Side Verdugo. He further opined that defendants were active members of East Side Verdugo and the charged crimes benefitted East Side Verdugo.

26

Defendants contend that "the prosecution elicited insufficient evidence that [defendants'] gang, East Side Verdugo, was a criminal street gang because it was comprised of separate cliques, and there was no evidence the cliques engaged in collaborative activity or shared a collective organizational structure[,]" therefore, there was insufficient evidence to support the gang allegation true findings.[15]  However, no one, including the prosecution's gang expert, testified that East Side Verdugo was composed of separate cliques—in fact, as recounted above, he stated that Meadowbrook operated under the umbrella of East Side Verdugo[16] and that all the cliques within East Side Verdugo got along with and were aligned with each other.  He also opined that East Side Verdugo, not Meadowbrook, was a criminal street gang that benefitted from the charged crimes, and defendants were active members of the former.

Defendants further assert that Meadowbrook "employs identifying symbols unique to their particular clique" citing the gang expert's testimony and "[t]he community 'recognizes "the Meadowbrooks" by itself.'"  However, what the expert testified in regard to the latter was, "[W]hen you say [']Meadowbrook,[' people] know that Meadowbrooks are associated with East Side Verdugo.  [¶] . . . Meadowbrook is directly

---

**15**  Of course, if this were the case, there would also be insufficient evidence to support the substantive gang offense.  (*People v. Ortega* (2006) 145 Cal.App.4th 1344, 1355.)

**16**  Defendant asserts that the People failed to produce evidence to support the expert's opinion that all the cliques operated under the umbrella of East Side Verdugo, but neither did the People offer supporting facts for all his other opinions.  He's an expert—giving opinions is what he does.  If the defense wished to challenge the factual basis for his opinions, that was a matter for cross-examination.

27

associated with East Side Verdugo, and . . . within the gang culture[,] when someone says 'Meadowbrook[,'] East Side Verdugo becomes represented by that. . . . [¶] . . . People will recognize ['] Meadowbrook . . . ['] by itself . They don't need to throw in the [']East Side Verdugo['] behind or in front of it." Instead of, as the defendants contend, the foregoing meaning that Meadowbrook is a "patently distinct group" from East Side Verdugo, it established that Meadowbrook and East Side Verdugo are one in the same. As to the fact that in some instances, members of the Meadowbrook clique of East Side Verdugo use the symbol "MB" and Milwaukee Brewers merchandise, this does not mean that they are not members of East Side Verdugo or that Meadowbrook is not completely integrated into and a part of East Side Verdugo, as was further evidenced by the defendants' tattoos, how they self-identified and what they said during the crimes.

As to the latter, the expert testified that Cardenas had a tattoo that is common to all Verdugo members, including East Side Verdugo's rival, West Side Verdugo. He further testified that Irvin had a large "East Side" tattoo on his chest, which is "related to East Side Verdugo" and had tattoos for three of the East Side Verdugo cliques elsewhere on his body. Juan had a tattoo covering his chest and stomach that said "ES Verdugo[,]" which stood for East Side Verdugo, and the same tattoo as Cardenas, which is common to Verdugo gangs. All three defendants variously identified themselves during past police contact as either East Side Verdugo Meadowbrook or East Side Verdugo—once, Irvin identified himself with another clique of East Side Verdugo. A picture of Cardenas and Juan throwing an East Side Verdugo gang sign was shown to the jury. The first assault victim and her husband testified that both Irvin and Juan invoked the name, "East Side

28

Verdugo," while at the formers' house. The victim of the bike robbery told the police that Irvin and Juan invoked the name of "East Side Verdugo" during their crime involving him. One of the Zarate brothers (see discussion, *infra*), involved in the substantive gang offense charge, told the police that one of the assailants said, "East Side Meadowbrook" and he told the 911 dispatcher that all three were claiming East Side Meadowbrook. His brother told the police that the driver of the car yelled out "East Side Meadowbrook" and "Verdugo." Their mother told the police that the assailants repeatedly yelled "East Side Meadowbrook" and "Verdugo."

In contrast to the facts here, the case cited by defendants in support of their position, *People v. Williams* (2008) 167 Cal.App.4th 983, 985 addressed, "the relationship that must exist before a smaller group can be considered part of a larger group for purposes of determining *whether the smaller group constitutes a criminal street gang*." (*Id*., italics added.) Therein, the facts were the opposite of those here, i.e., defendant asserted on appeal that there was insufficient evidence that he was an active participant in any group other than the smaller subset and there was insufficient evidence of a connection between members of the smaller subset and anyone else. (*Id*. at p. 987.) The gang expert testified that the larger group, the Peckerwoods, was a criminal street gang and the smaller group, the Small Town Peckerwoods, to which the defendant belonged, was a faction of the larger group, but his opinion in regard to the latter was based "on commonality of name and ideology, rather than concerted activity or organizational structure." (*Id*. at p. 988.) He also testified that the larger group had no constitution "for the most part" (whatever that means) and were a looser organization

29

than is typical for criminal street gangs, with a less well-defined rank structure. (*Ibid*.) He added that "*Peckerwood groups* get together more for bragging than for strategizing, and *one group of Peckerwoods* will not necessarily know what another group is doing." (*Ibid*.) The appellate court concluded, "[S]omething more than a shared ideology or philosophy, or a name that contains the same word, must be shown before multiple units can be treated as a whole when determining whether a group constitutes a criminal street gang. Instead, some sort of collaborative activities or collective organizational structure must be inferable from the evidence, so that the various groups reasonably can be viewed as parts of the same overall organization." (*Ibid*.) Here, in contrast to the facts in *Williams*, there was a wealth of evidence, as set forth above, that defendants were members of and identified with the larger organization, which was divided only by geography into cliques, but which cliques were friendly to and aligned with each other and were fully integrated into and dominated by the larger organization. Unlike the facts in *Williams*, where, presumably, there was an issue at trial as to whether a member of the smaller subset was also a member of the larger gang, there was no such issue here, with everyone acting as though a member of the Meadowbrook clique was also a member of East Side Verdugo. To force the People in every case in which a gang member is part of a clique—geographic or otherwise—within a larger gang to produce evidence about the structure of the organization and its activities would unduly add to their burden, especially, as here, where there was no such issue at trial.

Rather, this case is more similar to *People v. Ortega* (2006) 145 Cal.App.4th 1344, to which the defendants also call our attention, wherein "there was testimony that it was

30

not uncommon for members of different gangs to work in concert to commit a crime.  In light of the nature of gang structure and the apparent willingness of members to work with other gangs to commit crimes, requiring the prosecution to prove the specific subset of a larger gang in which a defendant operated would be an impossible, and ultimately meaningless task."  (*Id.* at p. 1357.)  In *Ortega*, the prosecution gang expert testified that the defendant was a member of a large gang, made up of 20-25 different subsets, the latter based on geography, and defendant was in one of those subsets.  (*Id.* at p. 1354.)  On appeal, the defendant contended that the large gang was "merely the geographical identity of a number of local gangs with similar characteristics, but is not itself an entity."  (*Id.* at p. 1355.)  The prosecution gang expert in *Ortega* offered the same type of testimony as the expert here, i.e, concerning the number of members, the commonly used symbols and color, the primary activities and other crimes committed by other members of the large gang.  (*Id.* at p. 1356.)  The appellate court concluded, "[e]vidence was thus presented, through the prosecution's gang expert, to establish every element of the existence of the [larger gang] as a criminal street gang.  . . .  [¶]  . . . We reject [the] defendant's assertion that the prosecution had to prove precisely what subset was involved in the present case.  No evidence indicated the goals and activities of a particular subset were not shared by the others. . . .  [¶]  . . .  [¶]  . . . There was no evidence that [the] defendant belonged to any gang other than the [large gang] . . . ."  (*Id.* at pp. 1356-1357.)[17]

_____

**17**  The same large gang as in *Ortega*, i.e., the Norteños, were the subject of *People*
*[footnote continued on next page]*

31

6. *Insufficient Evidence of the Substantive Gang Offense*

    a. *Cardenas's Involvement*[18]

The jury was instructed that it could not find any of the defendants guilty of the

substantive gang crime unless it agreed that each had committed a felony assault with

---

*[footnote continued from previous page]*
*v. Prunty* (2013) 214 Cal.App.4th 1110 [155 Cal.Rptr.3d. 64], review granted June 26, 2013, S210234, which is currently pending before the California Supreme Court. Therein, the defendant asserted on appeal that the People "wrongfully 'conflat[ed] multiple gangs into one.'" However, due to the differences between the facts there and here (e.g., the gang expert used crimes committed by members of a subset other than defendant's as the predicate offenses), it cannot be concluded that whatever outcome the Supreme Court devises will affect our conclusions here.

    [18] Although Juan joins in this argument, he devotes little energy to it, aside from stating that neither of the Zarate brothers nor their mother were able to identify him in or out of court. He cites no authority holding that this compels a conclusion that insufficient evidence supported the verdict. He also refers to Cardenas's argument that "the circumstantial evidence regarding the car involved, the assailant's tattoos and Cardenas'[s] admissions were as equivocal to [Juan] as Cardenas[,]" citing 12 pages of Cardenas's opening brief. In those 12 pages, Cardenas makes only a few references that apply at all to Juan. First, he asserts, as Juan does here, that the Zarates identified none of the defendants in or out of trial. We have already responded to this assertion. Second, Cardenas argued that although the Zarates described a dark Honda as containing their assailants and the defendants were driving a dark Honda when stopped a short time and a short distance from this crime, such cars are too numerous to tie Cardenas (and, by adoption of his argument, Juan) to it. As with Cardenas's argument, we disagree, especially because of the proximity of time and distance for all three sets of offenses. Cardenas did not discuss Juan's tattoos in his brief, but we discuss them *ante*. The fact that Cardenas's jail house phone call did not implicate Juan is not supportive of a conclusion that Juan was not involved in this crime. Under *People v. Aranda* (1965) 63 Cal.2d 518, and its progeny, any implication by Cardenas that Juan was involved would not have been admissible.

32

force likely to produce great bodily injury on either of the Zarate brothers or their friend.[19]

At 9:49 p.m. on May 28, 2012, the elder Zarate brother called the 911 dispatcher to report that three male Hispanics in their early 20's were leaving and returning to his house, in a black or blue, or dark older model Honda Accord. One had removed his shirt and had tattoos on his stomach and chest. One was bald and another had on a black baseball cap. One of the three hit his younger brother and a friend was also hit. One of the assailants had a handgun in his waistband, and he had begun to pull it out, but stopped when the Zarates's father appeared. The elder brother told the police that one of the assailants wore a black shirt. This brother testified that one of the three assailants tried to fight and struck the friend. He testified that the driver had tattoos on his arms and stomach, was not wearing a shirt and wore dark clothes. The other two wore black or blue tops and pants. The elder brother had told the police that the assailant who hit the friend said "East Side Meadowbrook." He told the police twice that the same assailant, who was the front passenger, told another, who had a gun, "Use the gun," twice.

The younger brother testified that he was riding his bike home when a four door Honda or Acura drove up and someone inside, who was wearing a hat, asked him for a cigarette, but he said he had none. His older brother and the friend approached and the

---

[19] The instruction also permitted a guilty verdict based on the charged offense that Juan, as a felon, possessed a gun during that incident, however, because the jury acquitted Juan of that offense, it necessarily based the guilty verdict on the aggravated assault of either Zarate brother or their friend.

three men got out of their car. The man who had asked for the cigarette tried to swing at the younger brother.

The Zarate's mother testified that the driver took his shirt off. He threw a punch at her younger son and the friend defended him.

A police officer testified that the elder brother told her that the driver took off his shirt and had tattoos on his stomach and called out "East Side Meadowbrook" during the fight. He told her that the front passenger wore a black shirt. The elder brother reported that the driver said they would return, and they did, several times. The officer testified that the younger brother told her that when he refused to give the driver of the Honda a cigarette, the latter got out and began swinging at the brother, who fought back. He said the driver yelled East Side Meadowbrook and wore a hat with the letter "W" on it. The officer testified that the Zarates' mother told her that the assailants repeatedly said "East Side Meadowbrook" and "Verdugo."

Another officer testified that the younger brother told him that the front passenger wore a red baseball hat. He also testified that the mother told him that the car was an older model Honda and the assailants said "East Side Meadowbrook" and "Verdugo." The mother said the front passenger was shirtless.

A police officer testified that when the Honda containing the defendants was stopped at 10:05 p.m., the defendants matched the descriptions given by the Zarate family. Irvin was wearing a black shirt and shorts. He had redness to his left eye suggesting he had been injured. Cardenas was wearing black shorts with a thin white and

34

light blue windowpane plaid design. Juan was not wearing a shirt and was wearing blue Dickies shorts. He had a large "ES" and a skull tattooed on his chest.

The officer who stopped the car a short distance from the crimes, testified that it was a mid-90's four-door dark gray Honda Accord with a darker hood. As she put on her emergency lights, the car pulled in front of a home and stopped. She pulled up behind it. The driver and registered owner, Irvin, and the front seat passenger, Cardenas, immediately got out of the car and tried to walk to the front gate of the home. The officer told both to step back towards the car and they hesitated. She repeated the command more sternly and they complied. They did not follow her subsequent orders, so she had them put their hands on the car. Juan, who was in the backseat along with a female, slouched down in the seat. Irvin wore a black baseball cap, had a shaved head and had tattoos on the sides and back of his neck. Cardenas had very short hair. There was another hat in the car. Cardenas was wearing the above-described shorts and a black t-shirt.

Cardenas asked the officer why they had been stopped. She said that three crimes had been committed "in the immediate area" and their car matched the description of the car involved in those crimes. Cardenas told her that he "wasn't involved." He said he had just arrived from Yucaipa and had been picked up nearby and given a ride to a house on the street where they stopped. After being *Mirandized*,[20] Cardenas said he was not at the scene of any crime. He said he had hooked up with two women in Yucaipa and had

---

[20] *Miranda v. Arizona* (1966) 384 U.S. 436.

35

spent most of the day and evening there. When asked about the location where the second assault victim had been stabbed, and after being confronted with the allegation that his tennis shoe prints were found at the scene of the incident involving the assault victims, Cardenas said, "'I don't even know myself how it went down. Sometimes you're just in the middle of something and it's like you can't—you try to help people, but you can't. But I'm not fucking God . . . " "I can't control nobody[.] [¶] . . . [¶] . . . I'll tell you that I can't stop something that ignorant people don't want to stop. Or other people want to start shit, it doesn't even matter. The whole point I was there and doing this and doing that, even if I was the peace builder[.]" He added that he was "still the bad guy" because he has a record. The officer interpreted the foregoing as meaning that Cardenas was present at the assaults but did not do anything wrong. His comments were consistent with the actions of one of the other persons present at the assaults, who tried to get Juan to leave, telling him that he had "fucked up."

During a post-arrest call from jail to a woman, Cardenas said, "I didn't do anything. I was there because they were jumping him and I saved him. . . . [T]hey got out of the car . . . [a]cting badass and they were getting jumped. . . . I got out and I fought. That's the one thing . . . that I did. These comments described what had happened during the incident at the Zarate home.

Given the proximity in terms of time and distance between the incidents involving the assault victims, which Cardenas admitted being at, and the incident at the Zarate house, and the same proximity between the stop of the vehicle containing Cardenas and both incidents, the match between the clothing worn by one of the assailants at the

36

Zararte home and Cardenas, the match between the car at both locations, the fact that Cardenas' gang's name was invoked at the Zarate home, the similar harassing behavior of the assailants at all three locations, the behavior of Cardenas at the stop and his jail phone conversation, from which a reasonable inference could be drawn that he participated in the incident at the Zarate home, there was sufficient evidence that he either directly committed or aided and abetted an aggravated assault against either of the Zarate brothers or their friend. Although the jury was not able to conclude, beyond a reasonable doubt, that Cardenas was involved in the charged assaults, evidence suggested that he was. We also find it notable that Cardenas said he had been with two women in Yucaipa, there were two women at the scene of the crimes involving the assault victims, one of whom was the woman who was in the car with all three defendants when they were apprehended.

7. *Motion to Acquit/Jury Instructions as to the Substantive Gang Offense*

As is relevant to this discussion, the jury was instructed that one of the elements of the charged substantive gang offense was, "The defendant willfully assisted, furthered, or promoted *felonious* criminal conduct by members of the gang either by: [¶] . . . directly and actively committing a *felony* offense; [¶] [or] [¶] . . . aiding and abetting a *felony* offense. As summarized above, the jury was further instructed, "Felonious criminal conduct means committing or attempting to commit an [a]ssault with [f]orce [l]ikely to [p]roduce [g]reat [b]odily [i]njury . . . ." "You must not find a defendant guilty of active participation in a criminal street gang . . . unless you all agree that the People have proved that the defendant committed a *felony* assault with force likely to produce great bodily

37

injury on either . . . Zarate [brother] . . . or [their friend] . . . ."[21]  The jury was directed to another instruction on the definition of felony assault with force likely to produce great bodily injury and it was given instructions on the elements of aiding and abetting felonious criminal conduct.

The defendants contend that the absence of instructions giving the jury the option of convicting them of the offense of simple assault as a lesser included offense of the *uncharged* felony assault with force likely to produce great bodily injury violated the principles of *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*).  Citing no authority whatsoever, defendants assert that whether an assault is a felony or a misdemeanor is an "element" of the crime.[22]  Based on this premise, they assert that the failure to instruct on the element, by giving the jury the option of deciding whether the assaults were felonies or misdemeanors, requires reversal of their convictions on the substantive gang offense.  They further assert that because the trial court denied their motion for acquittal on this count below by finding sufficient evidence of felony assault by means likely to produce great bodily injury, in response to their argument that the

[21]  See footnote 18, *ante*, page 32.

[22]  In their reply brief, defendants assert that the "felony status of the predicate offense [(here, assault by force likely to produce great bodily injury)] required for conviction of street terrorism is *an element* of street terrorism . . . ."  We have absolutely no quarrel with that, and as is clear from our setting forth the instructions given the jury, they clearly required it to find, beyond a reasonable doubt, that *the felony* of assault with force likely to produce great bodily injury had been committed by all three defendants. However, we part company with defendants that the jury needed to be told that they could find defendants guilty of misdemeanor assault by force likely to produce great bodily injury (whatever that is) or simple assault, then acquit them of the charged substantive gang offense.

38

evidence showed only misdemeanor assault, the trial court increased the punishment from zero (which would have resulted had the jury found them not guilty of the charged substantive gang crime upon its finding that only misdemeanor assault had occurred) to the 12-year term for the substantive gang crime, without a determination by the jury. Defendants also claim that, as a result of its ruling on the acquittal motion and the wording of the jury instructions, the trial court and not the jury made the determination that the charged substantive gang offense had occurred. We disagree with all their assertions, beginning with the first, i.e., that whether an assault is a felony or a misdemeanor is an element of the offense of assault. Assault by force likely to produce great bodily injury, is, as defendants point out, a wobbler, meaning that under certain circumstances, it can be considered a misdemeanor. What makes it a wobbler is the fact that *the trial court, in sentencing a defendant* who has already been convicted of assault by force likely to produce great bodily injury, has the discretion to impose either a prison sentence or time in county jail. (§ 245, subd. (a)(1).) Until imposition of sentence or judgment, a wobbler offense charged as a felony is regarded as a felony for all purposes. (*People v. Banks* (1959) 53 Cal.2d 370, 381.) The determination to impose prison or local time has nothing to do with the elements of the offense or the jury's obligation to find those elements. Additionally, the circumstances under which a wobbler is considered to be a misdemeanor have nothing to do with the jury exercising its fact-finding function.[23] Finally, there is no mechanism by which a jury can determine that a

---

[23] Those circumstances are as follows: "When a crime is punishable, in the

*[footnote continued on next page]*

39

*charged* assault by force likely to produce great bodily injury is a felony or a misdemeanor other than to receive an instruction on simple assault as a lesser included offense of assault by force likely to produce great bodily injury.

As the jury was instructed here, felony assault with force likely to produce great bodily injury contains all the elements of misdemeanor assault and has two additional elements not required of misdemeanor assault, i.e., *that the force used was likely to produce great bodily injury* and when the defendant acted he had the present ability to apply force *which was likely to produce great bodily injury*.  If this jury could not find those two additional elements, it had no option but to acquit the defendants of the charged substantive gang offense, which required a finding that a *felony* assault had occurred. There is no difference between this and giving the jury the option of finding that the

*[footnote continued from previous page]*
discretion of the court, either by imprisonment in the state prison or imprisonment in a county jail under the provisions of subdivision (h) of Section 1170, or by fine or imprisonment in the county jail, it is a misdemeanor for all purposes under the following circumstances:  [¶]  (1) After a judgment imposing a punishment other than imprisonment in the state prison or imprisonment in a county jail under the provisions of subdivision (h) of Section 1170.  [¶]  (2) When the court, upon committing the defendant to the Division of Juvenile Justice, designates the offense to be a misdemeanor.  [¶]  (3) When the court grants probation to a defendant without imposition of sentence and at the time of granting probation, or on application of the defendant or probation officer thereafter, the court declares the offense to be a misdemeanor. [¶]  (4)  When the prosecuting attorney files in a court having jurisdiction over misdemeanor offenses a complaint specifying that the offense is a misdemeanor, unless the defendant at the time of his or her arraignment or plea objects to the offense being made a misdemeanor, in which event the complaint shall be amended to charge the felony and the case shall proceed on the felony complaint.  [¶]  (5)  When, at or before the preliminary examination or prior to filing an order pursuant to Section 872, the magistrate determines that the offense is a misdemeanor, in which event the case shall proceed as if the defendant had been arraigned on a misdemeanor complaint.  (§ 17, subd. (b)(1)-(5).)

40

defendants committed the lesser included offense of simple assault and then acquitting them of the charged substantive gang offense because the former is not a felony. Defendants cite no authority holding that when a defendant is charged with a substantive gang offense and tried *on the theory* that he committed a felony assault, there is a sua sponte duty under *Apprendi*, or anything else, to instruct the jury on the lesser included offense of that felony assault. Nowhere do the defendants assert that they requested instructions on misdemeanor assault, regarding the charged substantive gang offense, and were erroneously denied them.

For the same reasons, we also reject defendants' assertions that the trial court directed a verdict by failing to grant the motion to acquit and giving the instructions it did. *People v. Lamas* (2007) 42 Cal.4th 516 (*Lamas*), which defendants cite in support of their position, has no application here and made no holding whatsoever on the notion of a directed verdict.

In *Lamas*, the defendant was charged with, inter alia, the substantive gang offense and the felony of being an active participant in a criminal street gang by carrying a loaded firearm in public. (*Lamas*, *supra*, 42 Cal.4th at pp. 519-520.) Absent a finding that the person is an active participant in a criminal street gang, carrying a loaded firearm in public is a misdemeanor. (*Id*. at p. 519.) Being an active participant in a criminal street gang, for purposes of the felony of an active gang member carrying a loaded firearm in public, is as defined by the substantive gang offense. (*Id*. at p. 523.) As to the charged substantive gang offense, the jury was instructed, inter alia, that the defendant had to have actively participated in a criminal street gang and "'either directly and actively

41

committed or aided and abetted other members of that gang in committing *the crime* . . . of carrying a loaded firearm.'" (*Id*. at p. 525, italics added.) The California Supreme Court held, "The . . . instruction . . . removed the element of involvement in felonious criminal conduct and required the jury to find that defendant committed or aided and abetted a misdemeanor offense, namely, carrying a loaded firearm in public [citation] rather than a felony offense as is required by the [substantive gang offense]." (*Ibid*.) The Supreme Court went on to observe, "[W]ith regard to the felony loaded-firearm offense . . . , the trial court erroneously instructed that, with regard to the finding that defendant 'willfully promote[d], further[ed] or assist[ed] in any felonious criminal conduct by members of [his] gang [citation] . . . *the term* [*felonious* criminal conduct] *includes possession of a loaded . . . firearm*.' The instruction . . . omitted an element, because, in the list of the elements necessary to prove [that an active gang member carried a loaded firearm in public], the instruction . . . required the jury to find only that defendant committed, or aided and abetted a gang member in committing, *a misdemeanor*, rather than that defendant had engaged in felonious criminal conduct." (*Id*. at pp. 525-526.) The California Supreme Court concluded, based on the holding in *People v. Robles* (2000) 23 Cal.4th 1106, that commission of the misdemeanor offense of carrying a loaded firearm in public is not sufficient to satisfy the elements of the substantive gang offense or to elevate the misdemeanor of carrying to a felony, and that an element of the substantive gang offense was that the defendant "willfully promoted, furthered, or assisted members of his gang in felonious criminal conduct that is *distinct from* his otherwise misdemeanor conduct of carrying a loaded firearm in public . . . ."

42

(*Lamas*, *supra*, 42 Cal.4th at p. 520.) "In other words, *all* of [the substantive gang offense's] elements must be satisfied, including that defendant willfully promoted, furthered, or assisted felonious conduct by his fellow gang members *before* [the subsection governing an active gang member carrying a loaded firearm in public] applies to elevate defendant's . . . misdemeanor offense [of carrying a loaded firearm in public] to a felony. . . . [The subsection governing an active gang member carrying a loaded firearm in public] applies only *after* [the section governing the substantive gang offense] has been *completely* satisfied by conduct *distinct from* the otherwise misdemeanor conduct of carrying a loaded weapon." (*Id*. at p. 524.) As the concurring opinion in *Lamas* observed, "[U]nder compulsion of *People v. Robles* (2000) 23 Cal.4th 1106 [¶] . . . [¶] . . . felony punishment under [the subsection governing an active gang member carrying a loaded firearm in public] is possible only if the prosecution can prove a complete violation of [the substantive gang offense] *without sole reference to the current firearm charge*. Under this rule, [the substantive gang offense's] element of willfully promoting, furthering, or assisting in any felonious criminal conduct by gang members cannot be satisfied by proof of the charged incident of carrying a loaded firearm, but must be established by proof of a separate felony." (*Id*. at pp. 527-528, italics added.)

*Lamas* dealt only with the particularities of the subsection governing an active gang member carrying a loaded firearm in public and the holding in *Robles*. Nothing in its conclusions or language has any application to the case at hand, which did not deal with that subsection. Certainly, *Lamas* does not stand for the proposition that the

43

prosecution cannot use an uncharged felony offense to prove an element of the substantive gang offense.

8. *Gang Enhancement Attached to the Aggravated Assault of the Second Assault Victim*

Juan contends that he received a *10-year* enhancement for the gang finding as to the aggravated assault of the second assault victim. Although Juan was charged with the subsection concerning the commission of *violent* offenses for the benefit of a gang (§ 186.22, subd. (b)(1)(c)), and the jury found that this allegation was true, the sentencing court's oral pronouncement, the minutes of the sentencing hearing and the abstract of judgment all reflect that the court imposed a five-year term for this enhancement. The total sentence of 43 years, which the sentencing court imposed, cannot be the result if the trial court, in fact, imposed a 10-year, rather than a five-year, term for the enhancement. Sadly, the People do not correct Juan.

Under the provisions of section 186.22, subdivision (b)(1)(B), if the offense is a *serious* felony, as defined in section 1192.7, subdivision (c), a term of five years is required for the enhancement. Section 1192.7, subdivision (c)(8) includes in the list of serious felonies "any felony in which the defendant personally inflicts great bodily injury on any person, other than an accomplice[.]" The charging document stated that count two's assault with a deadly weapon was "a serious felony within the meaning of Penal Code section 1192.7[, subdivision] (c)." The document further alleged in connection with the count that Juan "personally inflicted great bodily injury upon [this victim], *not an accomplice to the . . . offense*, within the meaning of Penal Code section 12022.7[, subdivision] (a) and also *causing the . . . offense to become a serious felony*

44

*within the meaning of Penal Code Section 1192.7*[*, subdivision*] (*c*)(*8*)." The jury found, in connection with this count, that Juan "personally inflicted great bodily injury upon [the second assault victim] within the meaning of Penal Code section 12022.7[, subdivision] (a)." Section 12022.7, subdivision (a) provides additional punishment for, "[a]ny person who personally inflicts great bodily injury on any person *other than an accomplice* in the commission of a felony[.]"

To the extent Juan wishes to convert his argument that the sentencing court improperly imposed a 10-year enhancement, erroneously believing count two was a violent felony, to an argument that it improperly imposed a five-year enhancement, erroneously believing count two was a serious felony, we will address the latter. Juan asserts that the count was not proven to be a serious felony because the jury instruction on the great bodily injury allegation, while requiring the jury to find that he inflicted said injury on the named second assault victim "omitted any requirement that the jurors determine the [second assault victim] was not an accomplice." Additionally, Juan asserts, while the finding on the great bodily injury allegation "contains a boilerplate reference to Penal Code section 12022.7" it does not mention that that named victim was not an accomplice. Taking the latter allegation first, and plugging in the language of the provision referenced in the jury's finding, it found that Juan inflicted great bodily injury on this victim within the meaning of the provision that applies to persons who inflict great bodily injury on anyone other than an accomplice to the commission of the felony. Juan cites no authority holding that that is an insufficient finding for purposes of imposing the five-year enhancement under section 186.22, subdivision (b)(1)(B). As to

45

the absence in the jury instruction of any requirement that the jury find that this victim was not an accomplice, although citing authority holding that the finding is to be "given a common sense reading in light of the *information, the instructions . . . and the language of the finding itself* (*People v. Paul* (1998) 18 Cal.4th 698, 706-707, italics added . . . )," Juan completely ignores the information and the language of the finding and focuses only on the instruction. At the same time, Juan concedes if this were only a claim of instructional error, it would be harmless beyond a reasonable doubt, as there was overwhelming evidence that this victim was not an accomplice. He then asserts "the problem is not with the instructions, but the finding." We will take him at his word. We reiterate that the finding was adequate to support the imposition of the five-year enhancement.

Juan's reliance on *People v. Mancebo* (2002) 27 Cal.4th 735, in support of his assertion that the findings are inadequate is misplaced. In *Mancebo*, the issue was "whether the circumstance of gun use was available to support two section 12022.5[, subdivision] (a) enhancements when gun use had already been . . . pled and proved as a basis for invoking One Strike sentencing[,] . . . [¶] . . . an alternative, harsher sentencing scheme for certain forcible sex crimes." (*Id*. at p. 738.) "[T]he One Strike law expressly mandated that the circumstance of gun use first be used in the calculation of the 'minimum number of circumstances' necessary to impose the One Strike indeterminate terms. [Citation.] Accordingly, gun use was unavailable as a basis for imposing the 10-year enhancements under section 12022.5[, subdivision] (a). But the trial court nevertheless imposed the section 12022.5[, subdivision] (a) enhancements,

46

believing it had the authority to substitute the specified circumstance of conviction of offenses against more than one victim [citation] . . . for the gun-use circumstance in order to satisfy the 'minimum number of circumstances' required to be pleaded and proved for One Strike sentencing treatment. [Citation.] [However,] . . . the information never expressly alleged a multiple victim circumstance under [the One Strike law], nor was the information ever amended to include this allegation. [¶] [The People] argued [that the imposition of] the section 12022.5[, subdivision] (a) gun–use enhancements w[as] . . . harmless because . . . the trial court could substitute in the circumstance of multiple victims [as a basis for imposing One Strike sentencing] and thereby free up gun use as a basis for imposing additional section 12022.5[, subdivision] (a) enhancements. Although the information did not specifically allege a multiple victim circumstance, [the People] urged that the charging and conviction of crimes against both victims *effectively* alleged and established that circumstance. . . . [However,] imposition of the section 12022.5[, subdivision] (a) enhancements violate[s] the pleading and proof provisions of [the One Strike sentencing law] and defendant's due process right to fair notice because there was no notice that the People, for the first time at sentencing, would seek to invoke the multiple victim circumstance to support One Strike sentencing so that gun use would become available as a basis for imposing additional section 12022.5[, subdivision] (a) enhancements." (*Mancebo*, at pp. 738- 739, italics added.) More specifically, the Supreme Court said, "[T]he One Strike law clearly applies only if the information alleges facts, *and also the 'circumstances* specified in [the One Strike sentencing law] which are required for the punishment provided [therein are] *pled and proved . . . .*' [Citations.] [¶]

47

. . . [T]he information neither alleged multiple victim circumstances nor referenced [the] subdivision [of the One Strike law governing multiple victims] in connection with those counts.  In other words, no factual allegation in the information . . . informed defendant that if he was convicted of the underlying charged offenses, the court would consider his multiple convictions as a basis for One Strike sentencing . . . .  Thus, the pleading was inadequate because it failed to put defendant on notice that the People, for the first time at sentencing, would seek to use the multiple victim circumstance to secure indeterminate One Strike terms under [the One Strike sentencing law] *and* use the circumstance of gun use to secure additional enhancements under section 12022.5[, subdivision] (a)."[24] (*Mancebo*, at pp. 744-745.)

Here, in contrast, the charging document was rife with warnings to Juan that the fact that he inflicted great bodily injury on the second assault victim, *who was not an accomplice*, made the offense a serious felony and would be used to enhance his sentence under the provisions of section 186.22.  Additionally, contrary to Juan's claim, *Mancebo* is not an inadequate findings case, but an inadequate charging/notice to defendant case.  A case cited in *Mancebo*, *People v. Jones* (1997) 58 Cal.App. 4th 693 (*Jones*) [Fourth Dist., Div. Two], is more on point with Juan's contention than *Mancebo*.  *Mancebo* said of *Jones*, "The *Jones* court found that the trial court's failure to instruct the jury sua sponte on the alleged circumstances that would qualify defendant for One Strike treatment was harmless beyond a reasonable doubt.  [Citation.]  The court rejected the

---

**24** Those circumstances include that the defendant be convicted in the case of specified offenses against more than one victim.  (§ 667.61, subd. (e)(4).)

defendant's claim that the jury was required to make a finding, separate from the verdicts, that each multiple victim circumstance alleged was true. . . . [T]he *Jones* court found any error was harmless. [Citation.] The *Jones* case simply did not present the due process lack of notice/pleading problems implicated here . . . ." (*Mancebo*, *supra*, 27 Cal.4th at p. 748.)

*Jones* was an opinion of this court, in which we concluded that the failure to instruct on the elements of the One Strike circumstances was either not error or was harmless error because the necessary findings flowed from findings the jury made on other issues, including the circumstance of multiple victims, which resulted from the fact that the jury convicted the defendant of crimes involving more than one victim. (*Id*. at pp. 709-710.) We concluded, "[E]ven if the trial court had not only failed to instruct the jury on the multiple victim circumstances, but had also failed to give the jury any verdict form for the multiple victim circumstances, the error would be harmless." (*Jones*, *supra*, 58 Cal.4th at p. 712.) Finally, the Supreme Court noted in *Mancebo*, "[O]ur holding is limited to a construction of the language of [the One Strike sentencing law] . . . as controlling here. We have no occasion in this case to interpret other statutory provisions not before us." (*Mancebo*, *supra*, 27 Cal.4th at p. 745, fn. 5.) Therefore, to the extent Juan relies on *Mancebo* to support his argument that the charging document here were inadequate, it provides no such support.

9. *Great Bodily Injury Enhancement on the Aggravated Assault of the Second Assault Victim*

The parties agree with the reasoning in *People v. Gonzalez* (2009) 178 Cal.App.4th 1325, 1331, 1332 that the sentencing court should not have imposed a three-year term for the great bodily injury enhancement on this conviction under section 12022.7, subdivision (a) because the fact that the crime involved great bodily injury was used to enhance the sentence under section 186.22, as discussed above, contrary to section 1170.1, subdivision (g). Therefore, we will strike the three-year enhancement.

10. *Attorneys Fees and Costs of Presentence Investigation and Probation Report Preparation*

The probation report for each defendant recommended that the sentencing court find that each had the then-present ability to pay appointed counsel fees in the amount of $500 and the cost of conducting the presentence investigation and preparing the probation report in the amount of $505, therefore, the sentencing court should order reimbursement for both. On the day set for sentencing, the sentencing court stated that counsel for each defendant had received the probation reports that day and, because of that, rescheduled sentencing for 18 days later. On that day, counsel for Juan and Irvin submitted, without commenting about the reimbursement of either amount. The sentencing court ordered Juan and Irvin each to reimburse for both, according to the recommendation of the probation report. Neither Juan, Irvin nor their attorneys objected to this. Over two months after the original date set for sentencing, Cardenas was sentenced, and he submitted, saying only, "I would ask for minimum fines and fees . . . ." The sentencing

court imposed reimbursement as recommended by the probation report and neither Cardenas nor his attorney objected. All three defendants now contest the reimbursement orders concerning the attorneys fees, claiming they lacked the notice and hearing required by section 987.8, subdivision (b) and due process, the sentencing court's finding that they had the ability to pay and that unusual circumstances existed as required by section 987.8, subdivisions (b), (f) and (g)(2)(B) and due process and insufficient evidence supports the orders. All three defendants also contest the reimbursement orders concerning the costs of presentence investigation and the preparation of the probation reports, claiming they lacked the notice required by section 1203.1b and they did not waive a court determination of ability to pay as required by that section and by due process, the sentencing court failed to make a determination of ability to pay or unusual circumstances and insufficient evidence supports the orders. Recently, in *People v. Aguilar* (2015) ____Cal.4th ___ (S213571) the California Supreme Court concluded that a defendant's failure to object to such orders in the trial court forfeited his challenge to them on appeal. Therefore, by failing to object below, defendants forfeited their current claims.

## DISPOSITION

Juan's three-year term for the great bodily injury enhancement attached to count two is stricken and the trial court is directed to amend the abstract of judgment and the minutes of the sentencing hearing to reflect this fact, as well as Juan's new total sentence of 40 years. In all other respects, the judgments are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

51

RAMIREZ
P. J.

We concur:

McKINSTER
J.

KING
J.