[No. C047487. Third Dist. Dec. 20, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDRE LUIS ORTEGA, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rule 976.1, only the Introduction, Facts and Procedural Background, part IV of the Discussion, and Disposition are certified for publication.

COUNSEL

Mark L. Christiansen, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Carlos A. Martinez and Marcia A. Fay, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BLEASE, Acting P. J.—**

## Introduction

Defendant, Andre Luis Ortega, murdered Walter Adams when defendant and Roque Bejarano were on a test drive of a vehicle Walter Adams had for sale. The test drive was merely a ruse to get to Walter Adams, whose son, Steve, was believed to have stolen jewelry and money from relatives of Robert Sisneros. Sisneros, Bejarano, and defendant were all part of the Norteños criminal street gang.

A jury convicted defendant of the first degree murder of Walter Adams. The jury also found true special circumstance allegations that the murder was committed by means of lying in wait, and that defendant killed Adams, or aided and abetted the killing while being an active participant in a criminal street gang. The jury found defendant had intentionally and personally discharged a firearm in the commission of the murder. The jury found the murder was committed for the benefit of, at the direction of, or in association with a criminal street gang, and that defendant was guilty of actively participating in a criminal street gang. The trial court sentenced defendant to life in prison without the possibility of parole on the murder conviction, plus

a consecutive 25-year-to-life term for personally and intentionally discharging a firearm in the commission of the murder. The trial court stayed a 10-year sentence for committing the murder in association with a criminal street gang, and stayed a two-year sentence for street terrorism.

Defendant argues the trial court erred in allowing the prosecution to proceed on a theory of felony murder based upon robbery because it was found at the preliminary hearing that there was insufficient evidence to hold defendant over on the special circumstance allegation that the murder was committed while defendant was engaged in the commission of a robbery. Defendant also argues the trial court improperly instructed the jury on the theory of murder by lying in wait, and improperly refused to instruct on manslaughter as a lesser included offense. Defendant claims the gang-related count and findings should be reversed because of insufficiency of the evidence and because the court failed to require unanimity on which gang was involved. He also claims his motion to bifurcate these issues should have been granted. Defendant argues the prosecutor engaged in misconduct, and that the trial court erred in allowing the prosecutor's closing argument chart to be provided to the jury. Defendant additionally claims the trial court erred in failing to exclude certain unfavorable evidence. We find no error, and shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Placer County Sheriff's Deputy Paul Long testified he responded to a report of a burglary in Newcastle, California on January 10, 2002. The address to which he reported was the residence and work address of Miller and Aggie Lee, husband and wife. Aggie ran a palm reading business from that location. The Lees reported that guns, coins, credit cards, and heirloom jewelry had been stolen.

Two days after the burglary report Miller Lee told Deputy Long they had received information that the burglar was Steve Adams from Stockton. Deputy Long investigated and discovered that Steve Adams's address in Stockton was a palm reading business, and that Gary, Walter, and Lucy Adams were also related to that address.

Some of the jewelry the Lees reported as stolen turned up in a pawn shop in Stockton. Miller Lee purchased some of the jewelry that had a sentimental value, but one piece, a diamond bracelet, was not recovered from the pawn shop. The Placer County Sheriff's Department received almost daily calls from Miller Lee asking for the status of the investigation into the burglary. Miller Lee called less frequently after sheriff's deputies informed him there was no evidence linking Steve Adams to the crime. The calls from Miller Lee ended sometime in February 2002.

Steve Adams's mother left Steve with Walter and Walter's sister Dolly when Steve was a baby.[1] Steve was referred to as Walter's adopted son. Dolly and her sisters worked at a palm reading business on East Harding Way in Stockton. The Adamses refer to themselves as gypsies or Yugoslavians. Dolly had heard accusations from other gypsies that Steve was robbing gypsies from out of town.

Walter had a Ford Explorer he had been trying to sell for a while. On the morning of the murder, October 23, 2002, Dolly received a phone call asking whether they had a car for sale. When Dolly told the caller they did, he said he would come take a look at it. Dolly told the caller that the car was not there at the time, and he hung up. The man called again in the afternoon, saying he was coming from the Fresno area to take a look at the car, and bringing his aunt, who had the money to buy the car.

Two young Hispanic men arrived to look at the car. Walter left in the car with the two young men around 2:30 p.m. Walter was wearing a gold bracelet he had possessed for four or five years. Dolly became concerned after 30 or 40 minutes had passed and Walter had not come back. Dolly had a friend take her to the mall around 6:00 p.m. to see if Walter's car might be in the parking lot. They could not find it, and by the time they got back home Steve had called the police.

The next morning around 9:00 a.m., Stockton police investigator David Anderson was dispatched to the west frontage road of Highway 99 when a report came in that a Ford Explorer had been found with Walter Adams's body inside. Walter's body was in the passenger seat. There were rope burns from his mouth to his ear lobes, several gunshot wounds to his right shoulder area, and a rope was draped around his chest. Three expended shell casings from a .380-caliber semiautomatic handgun were in the driver's seat area, one was in the center console, one was on the right rear floorboard, and a sixth one was underneath the victim. The victim's wallet containing $11 was in his right rear pants pocket, but he was not wearing a bracelet.

Officer Anderson's observations led him to conclude someone had been sitting in the backseat of the vehicle when the victim was killed. His conclusion was based on the fact that the driver's seat was pushed completely forward as if someone had exited the vehicle on the driver's side from the backseat.[2] The vehicle could not have been driven with the seat in that position. The rope burns on the victim's mouth were unlikely to have been caused by a person in the front seat, because a person could not have exerted

---

[1] Members of the Adams family will be referred to by their given names.

[2] The Explorer was a two-door vehicle.

enough pressure from that position. Also, the ends of the rope, which was still draped over the victim, were pointed over his shoulders towards the back of the seat. The gunshot wounds came from a position directly above the victim into his right shoulder. There were no bullet holes indicating the victim was shot from the front, because those bullets would have exited the victim's body and gone into the seat. The location of the shell casings was consistent with someone in the backseat having fired the gun, although it was also possible from the casings that the shots could have come from the driver's seat area.

The Explorer was processed for fingerprints. Bejarano's fingerprint was discovered on the exterior of the passenger window, his left palm print was on the interior of the driver's door, and his right palm print was on the exterior of the passenger door. Defendant's fingerprint was discovered on the exterior of the passenger door window frame.

Dr. Robert Lawrence performed Walter's autopsy. He determined Walter died as the result of massive hemorrhage and shock from multiple gunshot wounds. The gun muzzle had been either in contact with the victim's skin, or within less than an inch. Dr. Lawrence was also of the opinion that the shooter had been in the backseat behind the passenger. He opined the person in the backseat had been holding onto the rope with one hand and reaching around with the gun and firing downward. It was not likely that the shooter was either in the driver's seat or standing outside on the passenger side of the vehicle. Dr. Lawrence did not go to the crime scene, and did not know if there was any blood spatter inside the vehicle.

Noori Zamanian, who lived on the Highway 99 frontage road, called the Stockton Police Department the morning of October 25, 2002, after reading a newspaper article about the victim's body and truck having been found. Zamanian reported two Hispanic males had come to his house two days earlier and asked to use the phone. Police officers removed Zamanian's telephones and tested them for latent prints. Defendant's fingerprint was found on one of the telephones.

Defendant was the first of the three suspects to be arrested and interrogated. He told investigators that he, Bejarano, and Sisneros had gone to Stockton in Sisneros's vehicle to find someone that had committed a robbery, to scare the person, and to send him a message to stop robbing. They spent an hour or two looking for the person, and when they were unable to find him, decided to find the person's father and send the message to him instead. They knew the father had a vehicle for sale, so they called the number and pretended they wanted to test drive the vehicle in order to make contact with the father.

The three agreed that defendant and Bejarano would go with the victim on the test drive, and Sisneros would follow them in his car. They were on the freeway when the victim said he had an appointment and needed to go back. Bejarano, who had been driving, pulled over to let the victim take the driver's seat. When Bejarano reached for the driver's door, defendant threw a rope over the victim's head. He intended to put the rope around the victim's neck, but it got caught on his mouth. By this time, Bejarano was standing outside the passenger door and saw the rope was caught in the victim's mouth. He told defendant, "[y]ou got to do it," so defendant pulled out a gun and fired. He was sitting directly behind the victim when he shot him.

Defendant and Bejarano ran across the freeway to the other side of the frontage road, where they asked a resident if they could use his phone to call for a ride. Sisneros had not followed them, and they had no idea where he was. Defendant first tried to call his cell phone, then called his home phone in Sacramento. He spoke with Marissa, Bejarano's girlfriend, and told her to contact Sisneros to come pick them up. Shortly after that, Sisneros picked them up and they went back to Sacramento.

Defendant admitted he had joined the Norteños when he was 10 or 11 years old. Defendant said there was no way to get out of the gang, but he did get away from the crowd and try to stick to himself.

Bejarano testified at trial pursuant to a plea agreement. He stated that on October 22, 2002, defendant asked him if he wanted to go somewhere the next day and make some money. It was Bejarano's understanding they were going to do a "lick," i.e., some criminal activity for the purpose of monetary gain. The next morning Bejarano agreed to do the lick. Sisneros picked up the two of them and they drove from Sacramento to Stockton. Sisneros said they were looking for someone, and they began driving around Stockton searching for that person.

Bejarano was aware defendant had a gun because he had seen it. While they were driving around, Sisneros made a lot of phone calls regarding the fact that they could not find the person for whom they were searching. Eventually, Sisneros made a phone call and told the person on the other end they could not find the target, but that they had seen the target's father. When Sisneros hung up, he said they were going to go look for the dad.

They went to a palm reading shop and Bejarano called the number from a "for sale" sign on an Explorer parked in front of the shop. A woman answered and told Bejarano the owner of the vehicle was not in, and that he should call back. Bejarano called back later and said he was coming from Fresno and wanted to test drive the vehicle. They waited another 30 to 40

minutes before going back to the palm reading business. During that time they talked about what was going to happen. While Bejarano drove the Explorer, defendant was going to sit in the backseat and strangle the man with a rope obtained from the back of Sisneros's car. Defendant did not want to shoot the man because he did not want to leave shells behind at the scene. Sisneros told them the man was wearing a diamond bracelet and expensive diamond ring, and to be sure and get the jewelry. Bejarano did not know why the man was being killed, other than Sisneros said it was to send a message to the man's family.

As Bejarano was driving the Explorer, he noticed Sisneros following them at first, but then noticed he was not there. He drove the car onto Highway 99. After he went past a couple of exits, the victim said he needed to get back for an appointment. Bejarano pulled over and told the victim he did not know the area and did not know which road to take. The victim said he would drive. Bejarano was out of the car, and the victim had opened the passenger door when defendant put a rope over the victim's head. Bejarano ran around to the passenger side and told defendant the rope was in the man's mouth. Bejarano shut the door because he figured defendant was going to shoot the victim. Bejarano heard defendant shoot the victim five or six times.

Bejarano and defendant ran away from the vehicle. They ran over an overpass, went to a house, and knocked on the door. No one answered at the first house, but when they went to a second house a man came out from the side of the house. They told him their car had broken down on the freeway and they needed to use the phone. Defendant made the phone call. They waited outside, and Sisneros soon came and drove them back to Sacramento.

During the drive, Bejarano saw defendant holding the diamond bracelet the victim had been wearing. At one point during the drive Sisneros talked to someone on the phone to let them know the deed was done and to set up a meeting. They met that evening in a parking lot in the Sunrise area of Sacramento. Sisneros met the person in a parking lot. As they were driving away from the meeting Sisneros said he got $2,000 for the job. He gave defendant some of the money, and defendant gave Bejarano $200. Sisneros said he had shown the guy the bracelet to let him know the job was done.

Bejarano had performed a lick previously with defendant when defendant asked him to go to Willits, California and steal some marijuana plants. They did that lick with Raymond Royal and Raymond Rios. Bejarano thought Royal might have been associated with the Oak Park Bloods. When they took the marijuana plants, Bejarano and Royal went to the backyard while defendant held the people in the house at gunpoint. At one point someone tried to grab some of the plants from Royal, and Royal shot him. Both

defendant and Royal had guns for the Willits robbery. Defendant's gun was a .380-caliber automatic handgun, the same handgun he used to kill Walter Adams. When police were dispatched to the Willits robbery, they found a man with two gunshot wounds to his chest, a woman with a gunshot wound to her knee, and a man with blunt force trauma to the head.

Bejarano testified that defendant sported gang tattoos, and that he was once a member of the Norteño gang. Bejarano was not sure whether defendant considered himself a gang member at the time of the Adams murder. When police interviewed Bejarano in January 2003, he told them both defendant and Sisneros were members of the Norteño gang. He stated he "associated" with Norteños. Bejarano admitted he had entered into a plea agreement by which he would receive 18 years in prison in exchange for his truthful testimony.

Sisneros also admitted he entered into a plea agreement after being charged with the murder of Walter Adams. In exchange for his truthful testimony, he agreed to a 20-year prison sentence.

Sisneros testified he was related to gypsies Johnny Mitchell and Miller Lee. Sometime in 2002, Miller Lee approached him and defendant about some property that had been stolen from Lee, and asked if Sisneros would be interested in trying to recover it. Lee said he wanted Sisneros to recover the property and scare the man who had stolen it. Sisneros said the gypsies treated him with respect because he had been incarcerated, and they assumed he was someone to fear.

Lee and Mitchell drove Sisneros to Stockton and took him by several houses where they believed Steve Adams might be living. One was a palm reading shop. Sisneros said they were just supposed to scare Adams, and Sisneros expected no compensation for it.

Sometime in October Sisneros called a couple of people to help him with the job. One of those people was defendant. Defendant and Sisneros were Norteños, were known to have guns, and defendant was not afraid to use a gun. Bejarano also went with them to do the job. Bejarano was also a Norteño.

On the day of the murder Sisneros kept in telephone contact with Lee and Mitchell. They discussed where Sisneros might be able to find Steve Adams. The plan was to scare Steve by beating him up. Sisneros, Bejarano and defendant went several places, but could not find Steve's car. Sisneros told Lee there was a red Ford Explorer in front of one house, and Lee told him he thought the Explorer belonged to Steve's father. Lee said that since the father

was not taking responsibility for his son, they should send a message to the father. Lee told Sisneros the victim wore expensive jewelry, and that some of it might belong to Lee. He wanted Sisneros to retrieve the jewelry. Sisneros told defendant and Bejarano this.

There was a "for sale" sign in the back of the Explorer. Miller told Sisneros to call the number. Bejarano agreed to make the phone call. Bejarano and defendant went to test drive the vehicle, and Sisneros planned to follow them in his car and pick them up afterward. However, Sisneros got stopped by a train and lost contact with the Explorer. When Sisneros could not find them, he headed back to Sacramento. Within about 20 minutes, he got a call from one of the men's girlfriends telling him defendant and Bejarano were stranded. Sisneros went to pick them up. He exited the freeway when he saw the Explorer on the side road, and soon saw Bejarano and defendant walking. After they got in the car, Bejarano showed Sisneros the bracelet he got from the victim. They discussed whether they could get any money for it. Defendant told Sisneros he emptied the gun into the victim and Bejarano took off running.

Sisneros got a phone call from Lee, and he told Lee they had the victim's bracelet. Lee said he wanted it. Lee told Sisneros to meet him in Sacramento. The three of them met Lee and Mitchell in a parking lot. Lee said he would get money to buy the bracelet. When Sisneros told Lee and Mitchell that Walter was dead, Mitchell said he got what he deserved.

After meeting with Lee and Mitchell, Sisneros dropped off defendant and Bejarano at a chicken place. He gave them $200 so they would have some money.

About a week later Sisneros met Lee again. He had given Lee the bracelet, and Lee paid him $3,500. He gave $100 to Bejarano.

Defendant testified at trial, and recounted a series of events that differed in several material respects from the statement he gave police shortly after the murder. He testified that Sisneros never told him why he wanted defendant to go out of town with him. He said he rode with Sisneros and Bejarano to Stockton, where they drove around to a couple of different locations, including a palm reading shop. Later, they were shopping when Sisneros and Bejarano told him Sisneros had contacted his cousin and the cousin told him where they could locate someone. Defendant did not know why they were trying to locate the person, and he was not curious about it. They went to the palm reading shop and Sisneros told him Bejarano was interested in buying a car. They got the number off of a "for sale" sign in the back window of a red Explorer. Defendant did not decide to go on the test drive with Bejarano until the last minute.

When Bejarano pulled the car over so that the victim could drive back to his house, Bejarano pulled a gun on him. The victim asked what was going on, and Bejarano told him his son had robbed Lee. Bejarano tossed a rope to defendant. The victim reached for Bejarano's gun and started fighting with Bejarano. Defendant panicked and threw the rope over the victim to get him to let go of the gun. Bejarano was standing outside the driver side door when he shot the victim six times. The victim was leaning over the center console with his head over the driver's seat.

Later, Sisneros told him that if anyone questioned him he should take the blame for the killing because he was the youngest one and would be out in a couple of years. He said if defendant did not keep quiet he would suffer the consequences later. Defendant testified that even though he had a gang tattoo on his back, he was never a gang member. He did, however, hang out with a lot of gang members.

Defendant's version of events was supported by the testimony of Duane Lovaas, a Department of Justice criminalist. He theorized that the shooter was the driver or was in the driver's position. His opinion was based on the location of the cartridge casings and the blood spatter evidence.

Deputy Ronald Aurich testified as an expert in criminal street gangs. He explained that Norteño is a criminal street gang made up of 20 to 25 different subsets in the Sacramento area. The subsets also have neighborhood affiliations. Aurich opined that defendant was a Norteño, and specifically a Barrio North Side Norteño. Aurich's opinion was based on defendant's gang logo tattoos, involvement in gang-related crimes, and the fact that he kept company with validated gang members. Aurich testified he had reviewed documentation indicating defendant had admitted his gang membership to the juvenile county probation officer.

Aurich opined that Sisneros was also a gang member. His opinion was based upon the Norteño prison gang symbols tattooed on Sisneros's chest, his involvement in gang-related crimes, the fact that he had been in prison, and that he kept company with other gang members. Aurich also opined Sisneros was a gang member with a certain status above a common gangster from the neighborhood.

Aurich opined that Bejarano was a Norteño gang member, based upon his association with other gang members, the crimes in which he was involved, the neighborhood in which he lived, and the people with whom he associated.

In Aurich's opinion Walter Adams's murder was gang related.

## DISCUSSION

### I–III*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### IV

### Gang-related Counts and Findings

The jury found true the special circumstance allegation that while defendant was an active participant in a criminal street gang, he intentionally killed the victim to further the activities of the criminal street gang. (§ 190.2, subd. (a)(22).)[6] It found true the allegation that defendant committed the offense for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).) The jury also found defendant guilty of violating section 186.22, subdivision (a), actively participating in a criminal street gang. The existence of a criminal street gang is an element of all three allegations.

■   A criminal street gang is defined as, "an ongoing association of three or more persons with a common name or common identifying sign or symbol [that] has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute[,] and . . . includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting *two or more* of the enumerated offenses (the so-called 'predicate offenses') during the statutorily defined period. [Citation.]" (*People v. Gardeley* (1996) 14 Cal.4th 605, 617 [59 Cal.Rptr.2d 356, 927 P.2d 713]; see *In re Jose P.* (2003) 106 Cal.App.4th 458, 466–467 [130 Cal.Rptr.2d 810].)

Defendant contends there was insufficient evidence to sustain a finding of the existence of a criminal street gang because the gang to which the prosecution's expert testified was the Norteño gang, and the term "Norteño" is merely the geographical identity of a number of local gangs with similar characteristics, but is not itself an entity. Defendant's contention is not supported by the evidence.

■   Defendant relies on *People v. Valdez* (1997) 58 Cal.App.4th 494 [68 Cal.Rptr.2d 135] (*Valdez*), noting that in *Valdez* the Sixth District Court of Appeal stated, "Norteño and Sureño are not the names of gangs." (*Id.* at

---

*See footnote, *ante*, page 1344.

[6] As stated in the unpublished portion of this opinion, undesignated section references are to the Penal Code.

p. 508.) However, in *Valdez*, the issue was whether the trial court had abused its discretion in allowing the prosecution's gang expert to testify that the defendant had acted for the benefit of a gang, the defendant arguing the issue was one of fact for the jury. (*Id.* at p. 507.) The pertinent facts were that "a group of individuals from a number of different Norteño cliques or gangs in San Jose came together one day and formed a caravan to attack Sureños." (*In re Jose P., supra*, 106 Cal.App.4th at p. 467.) The court stated that if the evidence had been that most or all of the participants in the caravan were from the same Norteño gang, then the jury might have been able to determine the " 'for the benefit etc.' " element as easily as an expert. (*Valdez, supra*, at p. 508.) "However," the court stated, "the facts of the case were not so simple. The participants in the caravan were a diverse group, with affiliations to different gangs. They united for one day to attack Sureños. At the time it assembled, the caravan was not a 'criminal street gang' within the meaning of the enhancement allegation. Moreover, their common identification as Norteños did not establish them as a street gang, for, as Officer Piscitello testified, Norteño and Sureño are not the names of gangs." (*Ibid.*) The court concluded the particular facts of the case were such that the jury could not determine whether a crime had occurred without the assistance of an expert. (*Ibid.*) Even assuming *Valdez* was correctly decided, a subsequent decision by the Sixth District reiterated that, "*Valdez* does not hold that there is no criminal street gang called Norteño." (*In re Jose P., supra*, 106 Cal.App.4th at p. 467.)

Detective Aurich, the prosecution's gang expert, testified there were thousands of documented Norteño gang members in Sacramento. He testified some of their commonly used symbols are the letter N, the Roman numeral IV, "catorce" (Spanish for 14), and the color red. He testified some of their primary activities are the commission of murder, assault, witness intimidation, carjacking, robbery, extortion, and dope dealing. Detective Aurich also testified regarding the facts of two crime reports of offenses committed by Norteños. One involved a shooting into a crowd of rival gangsters. The other involved a Norteño gang member shooting someone at a gas station who was wearing Sureño colors.

Evidence was thus presented, through the prosecution's gang expert, to establish every element of the existence of the Norteños as a criminal street gang. Unlike *Valdez*, there was no expert testimony in this case that Norteño is not the name of a gang, and, as the Sixth District Court of Appeal recognized in a later case, "the expert testimony in *Valdez* was evidence in that case, not this one." (*In re Jose P., supra*, 106 Cal.App.4th at p. 467.)

■ Detective Aurich testified there were thousands of Norteño gang members in the Sacramento area, and 20 to 25 subsets of Norteños. We reject

defendant's assertion that the prosecution had to prove precisely which subset was involved in the present case. No evidence indicated the goals and activities of a particular subset were not shared by the others. There was sufficient evidence that Norteño was a criminal street gang, that the murder was related to activity of that gang, and defendant actively participated in that gang. There is no further requirement that the prosecution prove which particular subset was involved here. As stated in *Valdez, supra*, 58 Cal.App.4th at pages 506–507, "gangs are not public and open organizations or associations like the YMCA or State Bar Association, which have a clearly defined and ascertainable membership. Rather, gangs are more secretive, loosely defined associations of people, whose involvement runs the gamut from 'wannabes' to leaders. Moreover, determining whether someone is involved and the level of involvement is not a simple matter and requires the accumulation of a wide variety of evidence over time and its evaluation by those familiar with gang arcana in light of pertinent criteria." (Fn. omitted.) In this case there was testimony that it was not uncommon for members of different gangs to work in concert to commit a crime. In light of the nature of gang structure and the apparent willingness of members to work with other gangs to commit crimes, requiring the prosecution to prove the specific subset of a larger gang in which a defendant operated would be an impossible, and ultimately meaningless task.

Defendant also argues a unanimity instruction was required as to which gang was involved. A unanimity instruction would not have been appropriate to this situation, thus was not required.

In *People v. Gunn* (1987) 197 Cal.App.3d 408, 412 [242 Cal.Rptr. 834], we explained the circumstances that required a trial court to give a unanimity instruction. "When an accusatory pleading charges a single criminal act, and the evidence shows more than one unlawful act, there is the possibility of a conviction even though the jurors are not in agreement as to the act upon which the conviction is based. [Citations.] It is the general rule in such cases that the prosecution either 'must select the specific act relied on to prove the charge *or* the jury must be instructed in the words of CALJIC No. 17.01 . . . that it must unanimously agree beyond a reasonable doubt that defendant committed the same criminal act. [Citations.]' " (*Ibid.*)

The name of a gang is not a criminal act. There was no evidence that defendant belonged to any gang other than the Norteño gang, thus there was no possibility the jury was in disagreement about the gang with which defendant associated. There was no need for a unanimity instruction.

V–X*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Sims, J., and Butz, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 18, 2007, S149784. George, C. J., did not participate therein.

---

*See footnote, *ante*, page 1344.