[No. C071195. Third Dist. May 25, 2016.]

THE PEOPLE, Plaintiff and Respondent, v.
SALVADOR BENJAMIN VASQUEZ, JR., et al., Defendants and
Appellants.

## COUNSEL

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant Salvador Benjamin Vasquez, Jr.

Victor Blumenkrantz, under appointment by the Court of Appeal, for Defendant and Appellant Jose Antonio Duran.

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant Joseph Vincent Sisneros.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon, Kenneth N. Sokoler and John W. Powell, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HULL, Acting P. J.**—While repeatedly shouting "Nortes" or "Nortenos," defendants Salvador Benjamin Vasquez, Jr., Jose Antonio Duran, and Joseph Vincent Sisneros violently assaulted and robbed a stranger in a business parking lot and then threatened or attacked several employees who witnessed the beating and called police. They were tried jointly and were each convicted of multiple offenses with related enhancements, as noted, *post.*

With each defendant joining in material contentions of the others to the extent they are relevant, defendants raise numerous purported errors on appeal. They first argue (1) as to their Penal Code section 136.1 convictions (undesignated section references are to the Penal Code), the jury never found

that Sisneros and Duran used force or the threat of force or violence to dissuade a witness; (2) Sisneros's and Duran's respective counsel were ineffective for failing to object to the section 136.1 force or violence special finding; and that (3) insufficient evidence supports their section 136.1, subdivision (c)(1) convictions.

Defendants next claim the court erred (4) by denying their motion to dismiss the entire jury panel, and (5) in imposing multiple punishments for the second degree robbery and dissuading a witness convictions contrary to section 654's prohibitions.

Finally, defendants raise several claims regarding the gang evidence admitted below as well as the sufficiency of the evidence to support the charged gang offenses and enhancements. They argue the court erred in admitting evidence of Duran's juvenile robbery adjudication through expert testimony because (6) it was more prejudicial than probative under Evidence Code section 352, and (7) it violated their Sixth Amendment right to confront witnesses. They further contend the court erred in (8) allowing the gang expert to opine on the specific intent of hypothetical gang members; (9) that their responses to jail booking questions regarding gang membership were inadmissible; (10) that insufficient evidence establishes the existence of a "criminal street gang" under *People v. Prunty* (2015) 62 Cal.4th 59 [192 Cal.Rptr.3d 309, 355 P.3d 480] (*Prunty*), thus requiring reversal of their substantive gang offense convictions as well as all of the attached gang enhancements; and (11) that insufficient evidence shows they "actively participat[ed]" in a criminal street gang under section 186.22, subdivision (a).

We affirm the judgments.

FACTS AND PROCEEDINGS

*The Assault and Robbery of Noah Fordyce*

After getting off work around 10:00 p.m. on April 19, 2010, Noah Fordyce purchased some nachos and drove to the Lowe's parking lot in West Sacramento. He parked and began eating while he watched a show on his iPod. The driver's side window of his car was down, and Fordyce's seatbelt was still buckled.

A red car occupied by several men pulled into the parking lot and parked behind Fordyce's car. Three men got out of the red car and came to Fordyce's driver's side window. They told him they had been drinking, and one of the men grabbed a nacho chip from Fordyce's food. The three men then returned to their car.

A few minutes later, the three men returned to Fordyce's window. One man reached in and grabbed Fordyce's iPod. The men began taking turns violently punching Fordyce in the head. While doing so, the men yelled out "Los Nortenos" or "Los Nortes" multiple times. One of the men said he had a knife. They demanded Fordyce's wallet and keys. Fordyce did not fight back and tried to cover his head from the blows, which continued even after he gave them his wallet and keys. During the assault, Fordyce's nachos were smeared on the inside and outside of his vehicle. Among other injuries, Fordyce suffered two facial bone fractures in the unprovoked attack.

*The Assault of Carlos Lozano*

While the three men were taking turns hitting Fordyce, four Lowe's employees, Rick Deanda, Chantelle Parr, Camden Cushing, and Carlos Lozano, walked out of the Lowe's store, which was closing. They immediately noticed a commotion and yelling coming from the direction of Fordyce's vehicle. They saw three men attacking Fordyce through his car window. One man was wearing a black sweatshirt or shirt, another was wearing a white hooded sweatshirt, and the third man was wearing a white shirt.

Deanda, the store manager, instructed the employees to stay away and to call the police. Deanda heard the word "Norte" yelled out during the attack on Fordyce.

Cushing called 911 to report the attack. While Cushing was on the phone with the 911 operator, one of the men accosting Fordyce noticed him on the phone and yelled out that Cushing was "calling the cops." The three men then got into their car and sped quickly towards Cushing. The man wearing the white hooded sweatshirt was driving. While the three men were distracted by the Lowe's employees, Fordyce got out of his car and ran to hide by the Lowe's store.

Cushing stepped behind a nearby light pole to put something between him and the car. After the car abruptly stopped, the three men jumped out and began yelling at Cushing, asking him, "You calling the cops on us, fucking Nigga, fucking Norte?" All three men were yelling at Cushing. The man wearing the black sweatshirt told Cushing, "I'll fucking shoot you. I got a fucking gun, Nigga. I'll fucking shoot you. You calling the cops on me?" Cushing saw the man holding a dark object near his waistband, which Cushing thought was a gun. While the man was threatening him, the other two men began running towards Cushing. Cushing turned and ran towards the parking lot exit.

Lozano was standing a short distance behind Cushing at the time. Frightened, Lozano stood still and put up his hands to signal that he did not want

any problems. The two men chasing Cushing, however, began attacking Lozano instead. They kicked and punched him in the chest and face. The man wearing the black sweatshirt stood back while the other two men attacked Lozano. Lozano heard someone yell, "Norteno." The men eventually stopped assaulting Lozano, got into their car, and drove away. As a result of the attack, Lozano suffered injuries to his nose, eyes, and face.

Parr walked quickly towards her car. She heard one of the men screaming that he was "going [to] kill this nigga," and another yelling "Norte." She saw the three men get into their car and drive towards Cushing and Lozano. She saw at least two of the three men attack Lozano. She drove out of the parking lot and then pulled over to call the police. While leaving, she saw two other men standing on the road near the parking lot exit. One was wearing a dark shirt and long jeans shorts, and the other was wearing a white shirt with a cartoon figure on it.

As Parr was on the phone with the police, she saw the red car drive by on the street. The man in the white hooded sweatshirt was driving, and the man with the white cartoon shirt, whom Parr had seen on the side of the road, was also in the car.

Minutes later, an officer called to the location of the assaults passed a red car matching the description of the suspects' vehicle. The officer stopped the car and saw the passenger in the backseat on the right moving around and throwing things out of the window. Luis Vasquez, defendant Vasquez's brother, was sitting in the right rear passenger seat. Duran was driving the car, and Vasquez was sitting in the front passenger seat. Ryan Boyd, also known as Ryan White or Derek White, was sitting in the center of the backseat, and Sisneros was sitting in the left rear passenger seat.

At the time, Duran was wearing a white hooded sweatshirt and was carrying a knife. Sisneros was wearing a white shirt that had a nacho cheese stain on the front. Vasquez was wearing a black shirt, which may have had the sleeves pushed up. Luis Vasquez was wearing a black sweater, and Ryan Boyd was wearing a white shirt with a cartoon logo on it. None of the men had changed their clothes since being arrested.

Upon searching the car, authorities found Fordyce's iPod and wallet, which were located on the floorboard under the driver's seat. A pair of jeans shorts with a red belt were in the backseat.

*Witness Identifications and Police Interrogations*

The suspects were taken to a nearby location for a "field showup." Fordyce was unable to identify any of the men, but did identify the red car as the one

in which his attackers were riding. Cushing identified Duran, Vasquez, and Sisneros as the men who attacked Fordyce and Lozano. Parr identified Duran and Vasquez as two of the primary assailants. She also identified Duran as the driver of the red car. Lozano identified Duran, Vasquez, and Sisneros as the men who assaulted him.

Thereafter, the police interviewed each defendant separately on videotape following standard *Miranda* warnings. (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*).) The interviews of Sisneros and Duran were played for the jury; the court prohibited the People from playing Vasquez's taped interview because he invoked his *Miranda* rights when the interview began.

Sisneros told police he was passed out drunk in the backseat of Duran's car during the attack and that he never hit anyone. He could not explain how the nacho cheese stain got on his shirt. When asked why his left hand was bruised and swollen, Sisneros, who was left handed, claimed his knuckles always looked that way.

In response to the interrogating officer's statement, "So, you're a norteno," Sisneros stated, "If I was to get locked up, I'd ride with northerners, yeah." Sisneros also told the officer that his "family was always northerner," and that he "just hood bang[s]." After the officer asked him whether he was a Norteno from Del Paso Heights, Sisneros responded that if he were "representing" himself, he "would go as a northerner, yeah. Northerner from the heights." Sisneros also admitted he knew Frank White, a well-documented Norteno gang member.

Duran admitted the red car was his and that he was driving the car that night. When asked how long he had been a Norteno, Duran responded, "Who said I was?" The officer then told Duran that apparently he had admitted being a Norteno gang member to someone in Sacramento. Duran also said he was "not proud of it" in response to the officer's question of whether he was proud of being a Norteno. He later denied being a gang member, however, and said he was not with any particular Norteno crew. When asked why his hands and knuckles were bruised, Duran claimed that his hands always looked that way. Towards the end of the interview, Duran yelled out "Norte" while attempting to communicate with another suspect in the room next door.

*Trial Proceedings*

A December 2010 information charged Duran, Vasquez, and Sisneros with the following: conspiracy to commit robbery (§ 182, subd. (a)(1); count 1), second degree robbery (§ 211; count 2), battery with serious bodily injury of

Fordyce (§ 243, subd. (d); count 3), assault with force likely to cause great bodily injury of Fordyce (§ 245, subd. (a)(1); count 4), dissuading a witness (§ 136.1, subd. (c)(1); count 5), criminal threats against Cushing (§ 422; count 6), assault with force likely to cause great bodily injury of Cushing (§ 245, subd. (a)(1); count 7), battery with serious bodily injury of Lozano (§ 243, subd. (d); count 8), assault with force likely to cause great bodily injury of Lozano (§ 245, subd. (a)(1); count 9), criminal threats against Lozano (§ 422; count 10), and active participation in a criminal street gang (§ 186.22, subd. (a); count 11). Duran was charged individually in count 12 with drawing and exhibiting a deadly weapon other than a firearm in furtherance of criminal street gang activity, but this count was later dismissed. (§§ 186.22, subd. (d), 417, subd. (a)(1).)

Several enhancements were alleged relating to the substantive offenses. For counts 1 through 10, the information alleged defendants had committed the crimes for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members. (§ 186.22, subd. (b)(1).) For counts 1, 2, 4 and 9, it was further alleged that all three defendants inflicted great bodily injury when they committed the charged offenses. (§ 12022.7, subd. (a).) And, for counts 2, 5, and 7, it was alleged Duran personally used a deadly weapon. (§ 12022, subd. (b)(1).) Defendants pleaded not guilty to all of the charges and enhancements.

*The Prosecution Case*

At trial, Fordyce, Deanda, Cushing, Lozano, and Parr testified about the above described events. Fordyce testified that the three men shouted out "Los Nortenos" or "Los Nortes" in a way that Fordyce was supposed to remember it.

Parr testified she was familiar with gangs having grown up in a neighborhood with numerous Norteno gang members, and understood the term "Norte" to be a gang-related term that referred to the Norteno criminal street gang. She feared retaliation for testifying. Although, during the field lineup at the time of the incident, she had identified Duran as the car driver wearing the white hooded sweatshirt and Vasquez as the man wearing the black shirt and jeans, who were two of the primary assailants, she was unable to identify any of the defendants at the time of trial.

Cushing, who was a military police officer, was also familiar with the term "Norte" from gang training he received from the FBI and the Department of Homeland Security. Based on his training, he believed the attacks on Fordyce and Lozano were gang related. He was afraid to testify because he feared gang retaliation.

At trial, Cushing identified all three defendants as the men who attacked Fordyce and Lozano. He specifically identified Vasquez as the man wearing the black sweatshirt who threatened to shoot him. Similarly, Lozano testified that Vasquez was the man in black who threatened to shoot him and Cushing. He identified Duran and Sisneros as the men who actually punched and kicked him. At the time of the attack, Lozano understood the term "Norteno" to be gang related, and he felt increased fear and intimidation as a result.

Detective John Sample, a veteran officer with the Sacramento Police Department, testified as the People's gang expert. Detective Sample had investigated hundreds of Hispanic criminal street gang crimes, and talked with or otherwise came in contact with Hispanic gang members on a daily basis. He had received specialized training in Hispanic criminal street gangs throughout his law enforcement career, and predominantly investigated the Norteno and Sureno criminal street gangs. He also talked with other officers about gang issues, reviewed gang reports from other jurisdictions, and reviewed field identification cards identifying gang members in the Sacramento area.

Detective Sample testified regarding Hispanic criminal street gangs generally, and about the "primary activities" of the Norteno gang specifically, including murder, assault with a deadly weapon, robbery, narcotics trafficking, firearms offenses, and weapons violations. The Norteno criminal street gang originated from a prison gang called Nuestra Familia. There are approximately 1,500 validated Norteno gang members in the Sacramento region, generally organized into sets or subsets based on the neighborhoods in which the gang members live. Some of these subsets include the Richardson Village Nortenos and Del Paso Heights Nortenos in North Sacramento as well as the Broderick Boys in West Sacramento, among several others.

These different Norteno subsets often hang out together and commit crimes together, including Richardson Village Nortenos and Norteno gang members from West Sacramento. According to Detective Sample, a Norteno gang member's first allegiance is to the Norteno gang itself, aside from their set or subset. Thus, a crime committed by a Del Paso Heights Norteno or a West Sacramento Broderick Boys benefits not only the other Norteno subsets but also the larger Norteno criminal street gang as a whole.

Common Norteno gang signs and symbols among all subsets of Nortenos include the color red, the words Norte or Northerner, the letter N, which is the 14th letter of the alphabet, the number 14 or any variation of that number including the numbers one and four, roman numerals XIV, or one dot and four dots. Norteno gang members often use hand signs to show their gang affiliation.

Detective Sample testified that in gang culture, respect is like street currency. Respect in a gang is obtained by committing crimes and other acts of fear or intimidation. Gang members "put in work" for the gang, meaning they commit crimes, to show their loyalty to the gang and to raise their status within the gang. Violent gang crimes intimidate members of the community from reporting crimes, which allows gangs to operate without inhibition.

Detective Sample opined that Sisneros, Vasquez, and Duran were all active Norteno criminal street gang members. He based his opinion about Sisneros on several factors, including that Sisneros was involved in the present crimes, which Detective Sample believed were gang related. Sisneros had also been found in the company of other Norteno gang members on multiple occasions, was documented wearing red gang-related clothing, and he admitted during the police investigation of the charged crimes that he "hood bangs" with Northerners and that his family members were Norteno gang members. Detective Sample also considered Sisneros's responses to jail classification questions where he said he hangs with Northerners, although he denied being a gang member.

For Vasquez, Detective Sample noted that the Sacramento Police Department had contacted him on multiple occasions associating with Norteno gang members, including during a 2009 homicide investigation. During those contacts, Vasquez was wearing red clothing consistent with Norteno-style dress. Vasquez had a tattoo on his chest of the letters "RVN," which Vasquez admitted stood for the Richardson Village Nortenos, a Norteno subset from Del Paso Heights. Three months before the attacks on Fordyce and Lozano, Vasquez had been shot three times while attending a gang-related party. In response to jail booking questions, Vasquez said he hangs with Northerners, although, like Sisneros, Vasquez denied any gang affiliation.

Photographs of Vasquez with other Norteno gang members, including one with Ryan Boyd (also known as Ryan White or Derek White), who was arrested with defendants, were posted on Vasquez's personal MySpace Web page as well as on a Richardson Village Norteno MySpace Web page. Some of the photographs depict Richardson Village Nortenos together with Norteno gang members from West Sacramento. Vasquez and the others are wearing red clothing and throwing gang signs with their hands. Several of the pictures were taken at the funeral of documented Norteno gang member, Frank White.

Finally, in opining Vasquez was an active member of the Norteno criminal street gang, Detective Sample considered a jail incident that occurred while Vasquez was awaiting trial. Vasquez appeared to give a small, written jail communication known as a "kite" to another inmate. The jail kite contained information about Norteno "curriculum" that included a structured training process for the gang.

Detective Sample testified that he had seen other confiscated kites, in both jail and prison, showing Norteno rosters of gang members within the facilities. Some kite rosters listed both Richardson Village Nortenos and Del Paso Heights Nortenos together.

For Duran, Detective Sample cited his "yes" answer on the jail classification questionnaire in response to a question asking if he had any gang affiliation. Duran listed "Northerner" on the form. While Duran was awaiting trial on the present charges, he and several other incarcerated Norteno gang members assaulted another jail inmate who wanted to drop out of the Norteno gang.

In concluding Duran was an active gang member, Detective Sample also considered the circumstances surrounding Duran's juvenile adjudication for robbery with a firearm. Duran and several Norteno gang members tied up a man, used derogatory terms for a rival Sureno gang member, and threatened to kill him if he did not give them his ATM card and PIN to withdraw money from the man's bank account. The investigation into the crime revealed the motive for the robbery was to obtain money to post bail for a Norteno gang member who had been arrested for stealing a car. Defendant was arrested in a house with Norteno gang graffiti and was wearing red clothing at the time. He also told investigators that he only hangs out with Norteno gang members.

The other two men who were in the car when defendants were arrested, Ryan Boyd and Luis Vasquez, were also Norteno gang members in Detective Sample's opinion. Boyd's gang monikers were "Ryno" or "Chap" or "Chappy," and he had been contacted by the police on numerous occasions associating with known Norteno gang members while wearing a red bandana, an item commonly worn by Norteno gang members. Detective Sample knew Boyd through other criminal gang investigations and had written several reports about him. Boyd was the victim of a gang-related stabbing. Searches of his residence revealed Norteno gang graffiti, and Boyd's mother told Detective Sample that Boyd considers himself a Norteno. He also appeared in photographs with other Norteno gang members, including one picture in which Vasquez was seen throwing gang signs.

Luis Vasquez, defendant Vasquez's brother, had been documented by the Sacramento Police Department in multiple reports as associating with known Norteno gang members. He was photographed wearing red gang clothing, and, like his brother, the letters "RVN" were tattooed across his stomach.

The prosecution presented evidence of three predicate offenses during trial. The first predicate offense, known as the Memorial Park incident, occurred in March 2010. Two brothers were assaulted by multiple Norteno gang members

in a West Sacramento park. One of the brothers was hit in the head with a hammer while the other was chased down and severely beaten. During the attack the Norteno gang members yelled out "Broderick," referring to the West Sacramento "Broderick Boys" Norteno subset.

The second predicate offense occurred when the same Norteno gang members involved in the Memorial Park incident tried to later intimidate the brothers and their family members by driving by their house while making shooting motions and threats. At least one of the gang members was convicted of committing an assault with a deadly weapon or with force likely to produce great bodily injury (§ 245).

Detective Sample testified about a third predicate offense, a murder committed by a validated Norteno gang member in 2007. The Norteno gang member was not affiliated with any particular Norteno set when he shot and killed an individual whom he believed was a rival gang member.

The prosecutor posed several hypothetical questions to Detective Sample tracking the evidence presented in the case. Detective Sample opined that the hypothetical crimes as described, including that the persons shouted "Norte" during the robbery and assaults, would benefit or promote the Norteno criminal street gang by informing the victims who was committing the crimes and that the gang members were violent. This would intimidate the witnesses and instill fear in the community, making it less likely the crimes would be reported. Over defense objections, the prosecutor also asked Detective Sample whether the hypothetical gang members involved in such crimes intended to further or assist the criminal street gang. Detective Sample responded that the hypothetical defendants, in his opinion, would intend their actions to promote or assist the gang.

### The Defense Case

None of the defendants testified. During closing, Duran's counsel argued the crimes were not gang related, but rather crimes of opportunity committed by a group of young people who had been partying but not otherwise associating as Norteno gang members. Similarly, Sisneros characterized defendants as a group of drunken young people who simply committed a crime of opportunity. Although his counsel acknowledged that Sisneros "ran with the Northerners," he denied the offenses were committed on behalf of the Norteno criminal street gang. Vasquez's counsel conceded that three men had committed various crimes, but argued that those men were Duran, Sisneros, and Luis Vasquez—not defendant Vasquez. He also argued that the crimes were not gang related.

*The Verdicts*

Before the jury began deliberating, the prosecution dismissed count 12 against Duran as well as the special allegations attached to counts 2 and 5 that Duran personally used a deadly or dangerous weapon when robbing Fordyce and dissuading Cushing from reporting the crime. The jury acquitted each of the defendants of one count of assault by means of force likely to produce great bodily injury. (§ 245, subd. (a)(1); count 7).) And Duran and Sisneros were acquitted of two counts of criminal threats. (§ 422; counts 6 and 10.)

In count 5, the jury convicted each defendant of dissuading a witness. The jury also found true the special findings for count 5 regarding using force or the threat of force to dissuade a witness. The three special finding forms include a caption identifying the individual defendant to whom each specific form applied. The text of all three forms, however, refers to Vasquez's name only. The jury convicted defendants of all other charges and found the attached enhancement allegations true, including the gang enhancements alleged under section 186.22, subdivision (b)(1).

The court sentenced Vasquez to an aggregate prison term of 25 years four months to life. Duran was sentenced to an aggregate term of 28 years eight months to life in prison, and Sisneros to an aggregate prison term of 22 years to life.

DISCUSSION

I–IX*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

X

*Evidence of a Criminal Street Gang*

Defendants were convicted of violating section 186.22, subdivision (a), the substantive gang crime of actively participating in a criminal street gang, and of several gang enhancements under section 186.22, subdivision (b). Following our request for supplemental briefing, they now claim insufficient evidence established the existence of a "criminal street gang" for purposes of the gang offense and the gang enhancements.

---

*See footnote, *ante*, page 909.

The substantive gang offense under section 186.22, subdivision (a) provides, "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished [as specified]." The gang enhancement imposes additional punishment for felony convictions "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).)

■ "The existence of a criminal street gang is unquestionably an element of both the enhancement and the substantive offense." (*In re Jose P.* (2003) 106 Cal.App.4th 458, 466 [130 Cal.Rptr.2d 810] (*In re Jose*), disapproved on other grounds in *Prunty, supra,* 62 Cal.4th at p. 78, fn. 5.) Section 186.22, subdivision (f) defines "criminal street gang" as "any 'ongoing organization, association, or group of three or more persons' that shares a common name or common identifying symbol; that has as one of its 'primary activities' the commission of certain enumerated offenses; and 'whose members individually or collectively' have committed or attempted to commit certain predicate offenses." (*Prunty,* at p. 67; see also § 186.22, subd. (f).)

While defendants' appeals were pending, the Supreme Court decided *Prunty,* which construed the definition of a "criminal street gang" under section 186.22, subdivision (f). (*Prunty, supra,* 62 Cal.4th at pp. 70–71.) *Prunty* also discussed the proof necessary to establish the existence of such a gang when the prosecution's theory turns on the conduct of one or more gang subsets. (*Prunty,* at p. 67.) The analysis applies to both the substantive gang offense and the gang enhancements. (*Id.* at p. 72, fn. 3.) We thus examine the effect of *Prunty* on defendants' appeals.

The defendant in *Prunty* identified as Norteno and specifically claimed the Detroit Boulevard set of the Nortenos as his own. (*Prunty, supra,* 62 Cal.4th at pp. 67–68.) He had shot at a perceived rival gang member at a Sacramento shopping center while uttering gang slurs and yelling the word "Norte." (*Ibid.*) The prosecution sought to prove he committed the charged crimes to benefit the Sacramento-area Norteno street gang. (*Id.* at p. 67.)

To establish the gang enhancement, the prosecution's gang expert testified about the Sacramento-area Norteno gang's general existence and origins, its use of shared signs, symbols, colors, and names, its primary activities, and the predicate activities of two local neighborhood subsets, the Varrio Gardenland Nortenos and the Varrio Centro Nortenos. (*Prunty, supra,* 62 Cal.4th at pp. 67, 69.) The gang expert, however, did not provide any specific

testimony connecting the subsets' activities to one another or to the Sacramento Norteno gang in general. (*Id.* at p. 67.)

■ In reversing the gang enhancement for insufficient evidence, the Supreme Court found the prosecution failed to show a connection among the subsets it alleged comprised the criminal street gang. (*Prunty, supra,* 62 Cal.4th at p. 68; § 186.22, subd. (b).) "[W]here the prosecution's case positing the existence of a single 'criminal street gang' for purposes of section 186.22(f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets." (*Prunty,* at p. 71.)

The court explained that the necessary "connection may take the form of evidence of collaboration or organization, or the sharing of material information among the subsets of a larger group. Alternatively, it may be shown that the subsets are part of the same loosely hierarchical organization, even if the subsets themselves do not communicate or work together." (*Prunty, supra,* 62 Cal.4th at p. 71.) Evidence that "various subset members exhibit behavior showing their self-identification with a larger group" may also be sufficient to allow those subsets to be treated as a single organization. (*Ibid.*) However the "prosecution chooses to demonstrate that a relationship exists" (*id.* at p. 72), the evidence must show that "the gang the defendant sought to benefit, the individuals that the prosecution claims constitute an 'organization, association, or group,' and the group whose actions the prosecution alleges satisfy the 'primary' activities' and predicate offense requirements of section 186.22(f), [are] one and the same." (*Id.* at pp. 75–76.)

■ *Prunty* provided several examples demonstrating how to establish the necessary connection between various subsets and an alleged larger gang for purposes of the gang enhancement. (*Prunty, supra,* 62 Cal.4th at p. 77.) For more formal groups, evidence showing shared bylaws or organizational arrangements, shot callers who answer to a higher authority, or that the subsets routinely protect the same turf may prove the connection. (*Ibid.*)

In situations where a group's structure is more informal, evidence showing various subsets collaborate to accomplish shared goals, strategize to carry out activities, or profess or exhibit loyalty to one another would be sufficient to imply the existence of a genuinely shared venture. (*Prunty, supra,* 62 Cal.4th at pp. 78–79.) Evidence that gang subsets acknowledge one another as part of the same organization, coupled with evidence that the organization tends to operate in decentralized fashion in a relevant geographic area, may also be sufficient. (*Id.* at p. 79.)

Applying this framework to the evidence presented in *Prunty*, the Supreme Court first found that the prosecution sufficiently proved that the Sacramento-area Nortenos engaged in illicit primary activities since Detective Sample had testified that " 'the Nortenos' in the area engage in various criminal practices, including homicide, assault, and firearms offenses." (*Prunty, supra*, 62 Cal.4th at p. 82.) We note that Detective Sample provided similar testimony here.

What the Supreme Court found lacking, however, was evidence regarding the necessary predicate offenses. (*Prunty, supra*, 62 Cal.4th at p. 82.) While the gang expert in *Prunty* referred to two offenses involving three alleged Norteno subsets, which he characterized as Nortenos, "he otherwise provided no evidence that could connect these groups to one another, or to an overarching Sacramento-area Norteño criminal street gang." (*Ibid.*)

We find the evidence regarding predicate offenses in this case decidedly different than the evidence—or lack of evidence—proffered in *Prunty*. Expert gang testimony, coupled with other trial evidence, provided the required connection the Supreme Court found absent in *Prunty*.

The People's theory below was that the "criminal street gang" defendants sought to participate in and benefit was the larger Sacramento-area Norteno criminal street gang, which consisted of several local neighborhood subsets— the same theory set forth in *Prunty*. To prove the existence of this larger criminal street gang, the prosecution proffered predicate crimes committed by certain subset members. Defendants contend insufficient evidence links defendants and the subsets to this larger "criminal street gang." We disagree.

Officer Herrera, a gang investigator for the West Sacramento Police Department, testified to two predicate offenses—referred to as the Memorial Park predicates—committed by a West Sacramento subset of the Norteno street gang known as the Broderick Boys. Officer Herrera linked the West Sacramento subset to the defendants and the larger Sacramento-area criminal street gang through photographic evidence.

Given their "RVN" tattoos, the evidence showed that Vasquez and his brother Luis Vasquez claimed the Richardson Village Nortenos set from the Del Paso Heights area. Pictures posted on a Richardson Village Norteno MySpace page as well as Vasquez's personal MySpace page showed West Sacramento Norteno gang members, including Norteno gang members affili-ated with the Broderick Boys.

Vasquez and other West Sacramento Norteno gang members are seen in several pictures throwing Norteno gang signs and wearing red attire. Ryan Boyd (also known as Ryan White or Derek White), who was arrested with

defendants, is also pictured. Several of the pictures were taken at the funeral of Frank White, a well-documented Norteno gang member. Sisneros admitted knowing Frank White when he was arrested.

From this evidence, a jury reasonably could have concluded that Norteno subsets in West Sacramento associate with other Norteno subsets including the Richardson Village Norteno subset in Del Paso Heights. Members of both sets attended the funeral of a "well-documented" Norteno gang member. Such conduct shows a loyalty not only to their particular set but also an association with the larger Norteno street gang as a whole. (*Prunty, supra,* 62 Cal.4th at p. 78 ["evidence that two Norteño subsets have professed or exhibited loyalty to one another would be sufficient to show that the two subsets collaborate or cooperate"].)

The funeral pictures, we believe, also prove that "members of two gang subsets 'hang out together' and 'back up each other,' " thus demonstrating that "the subsets' members have exchanged strategic information or otherwise taken part in the kinds of common activities that imply the existence of a genuinely shared venture." (*Prunty, supra,* 62 Cal.4th at p. 78.) As Officer Herrera testified, part of the Sacramento-area Norteno criminal street gang's activities include "all get[ting] together for functions" such as "funerals."

Based on his experience as an expert in Hispanic criminal street gangs, Officer Herrera also testified that different Norteno sets comingle, hang out with each other, and often commit crimes together. Officer Herrera responded "yes" when asked whether it was "fair to say that Nortenos of any set, whether it be Del Paso Heights or Broderick Boys . . . follow the same ideology," and "use the same signs and symbols," including the number 14.

Detective Sample similarly testified that the violent acts of one Norteno subset help or benefit other sets under the rubric of the larger Norteno criminal street gang. When one set commits a violent crime, other members associated with the same umbrella gang receive the same fear and respect from the crime.

The evidence showed that the crimes were committed in West Sacramento, and that the defendants called out "Norte" or "Nortenos" during the attacks rather than any particular Norteno subset. Evidence also established that Sisernos used to live in West Sacramento, and now self-identified as a "Northerner from the heights." Such evidence tends to show that Norteno gang members can move fluidly among various gang territories, and that a gang member claiming one subset or area, such as Vasquez identifying himself as a Richardson Village Norteno through his tattoo and Sisneros characterizing himself as a "Northerner from the heights," may commit

crimes in the territory of other Norteno subsets. The jury, moreover, reasonably could have concluded that by calling out "Norte" during the vicious attacks on the nongang member victims in this case, the umbrella Norteno organization benefitted as the victims and other people in the community were more likely to attribute the attack to the Norteno criminal street gang in general.

Finally, Detective Sample testified that even though Norteno gang members may belong to different sets or subsets, their "foremost allegiance is to the Nortenos gang, aside from their set or subset." They demonstrate such allegiance through their shared use of the same colors, the same monikers, the same letters, and the same identifying symbols linking them to the larger Norteno gang.

■  This evidence sufficiently shows the behavior and practices of both West Sacramento Nortenos, including the Broderick Boys, and Del Paso Heights Nortenos such as the Richardson Village Nortenos, which could reasonably lead the jury to conclude the subsets shared an association with each other and the larger Sacramento-area Norteno criminal street gang. This stands in stark contrast to the evidence in *Prunty*, where the gang expert simply "described the subsets by name, characterized them as Norteños, and testified as to the alleged predicate offenses." (*Prunty, supra*, 62 Cal.4th at p. 83.)

Our conclusion is further buttressed after reviewing the evidence presented in two cases discussed in *Prunty*, *People v. Ortega* (2006) 145 Cal.App.4th 1344 [52 Cal.Rptr.3d 535] (*Ortega*) and *In re Jose P., supra*, 106 Cal.App.4th 458. (*Prunty, supra*, 62 Cal.4th at p. 78, fn. 5.) While the Supreme Court disapproved of the cases to the extent they did not require proof of an organizational or associational connection to show the existence of a single criminal street gang, the court nevertheless conceded that the evidence in both cases was likely sufficient to show the necessary connection under *Prunty*'s framework. (*Ibid.*)

The gang expert in *Ortega* testified that there were thousands of Norteno gang members in the Sacramento area that operated through subsets. (*Ortega, supra*, 145 Cal.App.4th at p. 1356.) In finding "[t]here was sufficient evidence that Norteño was a criminal street gang," the court noted that "[n]o evidence indicated the goals and activities of a particular subset were not shared by the others." (*Id.* at p. 1357.) And, there was further testimony "that it was not uncommon for members of different gangs to work in concert to commit a crime." (*Ibid.*) As discussed above, both Officer Herrera and Detective Sample provided similar testimony in this case.

The gang expert in *In re Jose* testified that the " 'Norteno' street gang" was an ongoing organization having around 600 members or associates in Salinas, which was separated into cliques or factions. (*In re Jose, supra,* 106 Cal.App.4th at p. 463.) According to the expert, two such subgroups, the Santa Rita and Salinas East Market Street gangs, were loyal to one another and to the larger Norteno street gang. (*Ibid.*) Similarly, expert testimony in this case showed that regardless of whether an individual was a West Sacramento Broderick Boys Norteno or a Richardson Village Norteno from Del Paso Heights, his first allegiance was to the Sacramento-area Norteno criminal street gang, and that both sets follow the same ideology and show their allegiance to the Norteno street gang by using the same signs and symbols.

The third predicate offense in this case, testified to by Detective Sample, also did not run afoul of *Prunty*. It involved a murder committed by Steven Duran (no evidence showed any relation to defendant Duran). He was validated as a Norteno gang member based on the crime, but was not affiliated with any particular Norteno set. The evidence thus showed Steven Duran identified with the larger Norteno criminal street gang alleged by the prosecution rather than a specific Norteno subset.

■ As the Supreme Court emphasized in *Prunty*, "[t]he key is for the prosecution to present evidence supporting a fact finder's reasonable conclusion that multiple subsets are acting as a single 'organization, association, or group.' " (*Prunty, supra,* 62 Cal.4th at p. 80.) We find the prosecution satisfied that burden here.

## XI*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment for each defendant is affirmed.

Robie, J., and Hoch, J., concurred.

Appellants' petitions for review by the Supreme Court were denied September 24, 2016, S235270. Corrigan, J., did not participate therein.

---

*See footnote, *ante,* page 909.